# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

STONE & PAPER INVESTORS, LLC, individually and derivatively on behalf of CLOVIS HOLDINGS LLC,

      Plaintiff,

v.

RICHARD BLANCH, VIVIANNA BLANCH, RED BRIDGE & STONE, LLC, BRIAN SKINNER and SKINNER CAPITAL, LLC,

      Defendants,

v.

CLOVIS HOLDINGS LLC,

      Nominal Defendant.

_____

RICHARD BLANCH, RED BRIDGE & STONE, LLC, and CLOVIS HOLDINGS, LLC,

      Counterclaim and Third-Party Plaintiffs,

v.

STONE & PAPER INVESTORS, LLC, EISENBERG & BLAU, CPAS, P.C., DDK & COMPANY, LLP, and RICHARD EISENBERG,

      Counterclaim and Third-Party Defendants.

_____

C.A. No. 2018-0394-PAF

# MEMORANDUM OPINION

Date Submitted: April 6, 2021
Date Decided: July 30, 2021

Richard I. G. Jones, Jr., David B. Anthony, BERGER HARRIS LLP, Wilmington, Delaware; David Lackowitz, Zaid Shukri, MOSES & SINGER LLP, New York, New York; *Attorneys for Plaintiff and Counterclaim Defendant Stone & Paper Investors, LLC.*

Catherine Damavandi, NURICK LAW GROUP, LLC, Wilmington, Delaware; *Attorney for Defendants and Counterclaim and Third-Party Plaintiffs Richard Blanch, Vivianna Blanch, and Red Bridge & Stone, LLC.*

John A. Elzufon, ELZUFON AUSTIN & MONDELL, P.A., Wilmington, Delaware; *Attorney for Third-Party Defendants Eisenberg & Blau CPAS, P.C., Richard Eisenberg, and DDK & Company, LLP.*

Richard Skinner, *pro se*.

**FIORAVANTI, Vice Chancellor**

This case presents a dispute among the members and managers of Clovis Holdings, LLC ("Clovis" or the "Company"), which was created in 2014 to acquire a business that sold stone-based paper products. The Company's non-managing preferred member, Stone & Paper Investors, LLC ("Stone & Paper"), alleges that the Company's two managers, Richard Blanch and Brian Skinner, fraudulently induced Stone & Paper to invest $3.5 million in the Company and then spent the Company's capital on themselves while doing nothing to advance the Company. Stone & Paper alleges that Blanch and Skinner's conduct breached their fiduciary duties and the Company's limited liability company agreement.[1] Stone & Paper claims that affiliates of Blanch and Skinner aided and abetted the managers' breaches of fiduciary duty and were unjustly enriched through receipt of unauthorized payments. The Company, at the direction of Blanch and Skinner, has asserted counterclaims alleging that Stone & Paper breached the LLC Agreement and was unjustly enriched when it received over $100,000 in Company funds and caused Clovis to pay unauthorized expenses charged to a credit card held in the name of one of Stone & Paper's principals.

The LLC Agreement required Blanch and Skinner to devote the Company's resources to acquiring the stone paper business of Tier1 International, Inc. d/b/a

---

[1] *See* JX 36 (Limited Liability Company Operating Agreement of Clovis Holdings, LLC, dated as of January 1, 2014) (the "LLC Agreement").

ViaStone ("ViaStone"). ViaStone has a distribution agreement with stone paper manufacturer Taiwan Lung Meng ("TLM") to distribute its product in the United States. The LLC Agreement required Stone & Paper's approval if the Company engaged in any business other than the ViaStone business. The LLC Agreement also contained restrictions and disclosure requirements on interested transactions, as the term is defined in the LLC Agreement. The evidence shows that Blanch and Skinner initially devoted their time, effort, and the Company's resources to acquiring ViaStone, but later changed course. By no later than late November 2015, unbeknownst to Stone & Paper, Blanch and Skinner abandoned the effort to acquire ViaStone and sought alternative pathways to enter the stone paper business. All the while, Blanch and Skinner were paying themselves $20,000 per month from Clovis's funds, which were deposited into accounts of their affiliates, Red Bridge & Stone, LLC ("Red Bridge") and Skinner Capital, LLC ("Skinner Capital"). Stone & Paper's principal, John Diamond, initially agreed to the payments to Skinner, but not to Blanch.

After abandoning efforts to acquire ViaStone, Skinner and Blanch embarked on draining nearly all of ViaStone's remaining funds and sought to conceal their activity by trying to recharacterize the payments to them as loans. By May 2018, when this action was filed, Skinner and Blanch had transferred approximately $2.5

2

million from Clovis to themselves or their affiliates, ultimately leaving Clovis with just $6,500 remaining in its bank account.

In this post-trial opinion, I find that Skinner and Blanch did not fraudulently induce Stone & Paper to invest in Clovis. The managers did, however, breach the LLC Agreement, violate their fiduciary duties to Clovis, and fraudulently conceal their conduct from Stone & Paper. I also find that Skinner's affiliate, Defendant Skinner Capital, and Blanch's affiliates, Defendants Vivianna Blanch and Red Bridge, are liable for civil conspiracy and aiding and abetting the managers' breaches of fiduciary duty and fraudulent concealment.

I find that Clovis's claim alleging that Stone & Paper received $100,000 in unauthorized payments is time-barred, but that Clovis prevails with respect to $21,000 paid for a newsletter subscription. I also find that Skinner, not Stone & Paper, caused Clovis to pay credit card expenses that were not reasonable Clovis expenses. Skinner is therefore liable to Clovis for the credit card payments.

## I.    BACKGROUND

The following recitation reflects the facts as the court finds them after trial.[2] The facts discussed herein have been proven by a preponderance of the evidence. There were 689 trial exhibits submitted into evidence. Six witnesses testified at the four-day trial,[3] with testimony from two more witnesses presented through video clips of their depositions. Some witnesses were more credible than others. Among the key players, Blanch was the least credible witness. I have therefore afforded his testimony minimal weight. Skinner's testimony was reliable at times, but overall he was willing to testify falsely when necessary to support his own self-interests. Vivianna Blanch was more reliable than Blanch or Skinner. I found her to be credible on many issues but evasive on others, particularly those implicating her husband's wrongdoing. John Diamond, a principal of Stone & Paper, was a generally reliable witness, but at times his recollection was vague. Because the parties' testimony is often in direct conflict, I have generally afforded contemporaneous documents and disinterested witness testimony the greatest weight in making my factual findings.

---

[2] The trial testimony is cited as "Tr."; deposition testimony is cited as "Dep."; trial exhibits are cited as "JX" or "PX"; and stipulated facts in the pre-trial order are cited as "PTO," with each followed by the relevant page, paragraph, or exhibit number.

[3] Trial was held remotely via Zoom technology.

## A.      The Members and Managers of Clovis Holdings, LLC

Clovis is a Delaware limited liability company, with its principal place of business in New York.[4]  Defendants Richard Blanch and Brian Skinner are the Company's sole managers.[5]   Skinner was in charge of Clovis's finances.[6]

Clovis has two common members and one preferred member.[7]  The common members are Defendant Red Bridge and Defendant Skinner Capital, with each owning 37,500 common units of Clovis.[8]  Red Bridge and Skinner Capital collectively control 75% of Clovis's total voting units.[9]  Red Bridge is a Delaware limited liability company with its principal place of business in New York.[10] Defendant Vivianna Blanch, who is married to Blanch,[11] was the sole member at Red Bridge's formation.[12]  Defendants Red Bridge, Richard Blanch, and Vivianna Blanch are collectively referred to herein as the "Blanch Defendants."   Skinner

---

[4] PTO ¶ 2.

[5] *Id.* ¶¶ 3 & 6.

[6] Tr. 404:20–23 (Skinner).

[7] LLC Agreement at A-1.

[8] *Id.*; PTO ¶¶ 4 & 5.

[9] PTO ¶ 5.

[10] *Id.*

[11] *Id.* ¶ 7.  To avoid confusion, Richard Blanch will be referred to as "Blanch" and Vivianna Blanch will be referred to as "Vivianna Blanch."  No disrespect is intended.

[12] Tr. 929:23–930:9 (V. Blanch).

Capital is a Delaware limited liability company.[13]  Brian Skinner is the principal of Skinner Capital.[14]  Brian Skinner represented himself *pro se* at trial in this action.

Plaintiff Stone & Paper is a Delaware limited liability company and Clovis's sole preferred member.[15]  Stone & Paper holds 25,000 preferred units of Clovis and 25% of the Company's voting power.  John Diamond and Albert Carter formed Stone & Paper to invest in Clovis.[16]

## B.  The Parties' Relations Before Clovis

Diamond and Carter were long-term business partners who founded Diamond Carter Trading, LLC ("Diamond Carter Trading").[17]  Diamond Carter Trading engaged in the business of market making in options and exchange traded funds.[18]

Skinner joined Diamond Carter Trading in 2001 after graduating from college.[19]  Skinner distinguished himself in his work, impressed Diamond and Carter, and rose to become a junior partner and Chief Operating Officer of Diamond Carter Trading.[20]  Diamond, Carter, and Skinner became as close as family, with

---

[13] PTO ¶ 4.

[14] *Id.* ¶ 3.

[15] *Id.* ¶ 1.

[16] Tr. 17:19–22 (Diamond).

[17] Tr. 7:24–8:9 (Diamond).

[18] Tr. 9:21–10:2 (Diamond).

[19] Tr. 8:13–23 (Diamond).

[20] Tr. 9:11–19 (Diamond).

Carter describing Skinner as a "brother" and Diamond describing Skinner as a "son."[21] Diamond testified repeatedly that he previously harbored a great deal of trust in Skinner.[22]

Blanch and Skinner met in 2003.[23] Blanch is a self-described "entrepreneur"[24] who previously founded a marketing consultancy named Masters of Branding. Blanch was also the CEO of a company known as Metier Tribeca LLC d/b/a Le Metier de Beaute ("Metier"), described as a "a beauty company that sold in retail."[25] Diamond and Carter met Blanch around 2007, and Skinner reintroduced Blanch to them in or around 2011 or 2012.[26] Diamond testified that he did not know Blanch well prior to getting involved in business together.[27]

On July 3, 2013, investors in Metier filed litigation against Blanch and Metier in the Southern District of New York (the "Metier Action").[28] The plaintiffs in the

---

[21] Tr. 8:13–23 (Diamond) & 9:8–17 (Diamond) ("[Carter] used to say that [Skinner] was like a brother to him. I used to say that he was like a son to me.").

[22] *See* Tr. 23:1–5 (Diamond) ("Brian Skinner and I had worked closely together for more than a decade. He was my right-hand man in business. I worked more closely with him than I did with [Carter]. I trusted him."); Tr. 118:3–12 (Diamond) (testifying that he trusted Skinner); Tr. 126:7–12 (Diamond) (same); Tr. 257:24–259:10 (Diamond) (same).

[23] Blanch Dep. 50:12–19.

[24] Blanch Defs.' Pre-Tr. Br. 7.

[25] Tr. 512:23–513:18 (R. Blanch); *see also* Tr. 154:11–157:1 (Diamond) (explaining the history of Metier).

[26] Tr. 9:1–7 (Diamond); Tr. 945:13–19 (Carter).

[27] Tr. 9:10–13 (Diamond).

[28] JX 7.

Metier Action alleged that they had invested approximately $5 million in Metier based on representations and contractual guarantees that the investments would generally fund the working capital requirements of the company. They alleged that Blanch "wired hundreds of thousands of dollars from the Company's accounts to his personal bank account, and to the bank accounts of other insiders, only hours after receiving Plaintiffs' investment monies."[29] According to the complaint in the Metier Action, Blanch "then altered the books and records of the Company to post backdated amounts due," and later characterized it as an accounting error.[30]

## C. Blanch and Skinner Encourage Diamond and Carter to Invest in the Stone Paper Business.

On May 16, 2013, Blanch sent Skinner an email with advice on how to further maximize his profits from his relationship with Diamond Carter Trading, Diamond, and Carter.[31] Blanch created a list of priorities "for how [Skinner] need[ed] to focus [his] negotiations" with Diamond and Carter in order to achieve "$330,000 in annual salary with $7MM of their capital at risk."[32] To do so, Blanch laid out a multi-step plan, which included Skinner asking Carter and Diamond to give Skinner $5 million

---

[29] *Id.* ¶ 2.

[30] *Id.*

[31] JX 4 ("Based on the conversations that we are having, I have come up with the following list of priorities for how you need to focus your negotiations with [Carter] and [Diamond].").

[32] JX 4.

to "fund future deals."[33] Blanch reiterated that acting on his plan in full would enable Skinner to "put $7MM into play in the next 6 months, make yourself $330,000 annually, and give yourself piece [sic] of mind for at least three years."[34]

Skinner then presented to Diamond a potential investment in ViaStone. ViaStone was an entity jointly owned and managed by Jeff and Christine Chow.[35] ViaStone held a distribution agreement with TLM, a stone paper manufacturer in China.[36] In an email dated May 20, 2013, Skinner exhorted Diamond to focus on the ViaStone opportunity: "ViaStone . . . is something we really need to look at" even though "this is not our normal thing."[37] Skinner worked on the prospect of having Carter and Diamond invest in the ViaStone entity during ViaStone's Series A financing round through Henry Kang, an investment banker at the Ajia Group ("Ajia"). On Blanch's side, Blanch introduced Kang to Drew Aaron, a close friend of Blanch.[38] Aaron's family business, The Aaron Group, is one of the world's largest paper brokers.[39]

---

[33] *Id.*

[34] *Id.*

[35] PTO ¶ 8. Because Jeff Chow was more involved in the events underlying this dispute than his wife, Christine Chow, references to "Chow" herein refer to Jeff Chow.

[36] *Id.*

[37] JX 5; Tr. 222:19–223:14 (Diamond).

[38] Tr. 517:17–519:1 (R. Blanch).

[39] Tr. 289:8–16 (Skinner).

9

In or around July 2013, ViaStone and Ajia circulated a draft stock purchase agreement.[40] Although the stock purchase agreement was purportedly never executed, Ajia made a deposit payment to ViaStone of at least $250,000.[41] On September 9, 2013, Kang sent Skinner a draft of an email to Diamond and Carter regarding the status of their prospective investment in ViaStone, which Skinner approved.[42] Kang sent the email to Diamond and Carter, and on September 11, 2013, Carter responded, stating that "our Diamond Carter group continues to maintain its desire to be included in this ViaStone investment round."[43] Carter requested that Ajia "continue to work closely with Mr. Brian Skinner so that we may be included in the ViaStone venture."[44]

Later the same day, Skinner and Kang exchanged a series of contentious emails. Skinner accused Kang of withholding information from him and making false representations regarding the status of another key investor's investment.[45] Skinner aggressively demanded information regarding the purchase price of ViaStone and how much money Kang had personally invested in the Series A

---

[40] PTO ¶ 8; *see also* JX 19.

[41] PTO ¶ 8; JX 19, JX 20, JX 21.

[42] JX 588.

[43] JX 14.

[44] *Id*.

[45] JX 15 at S0018203–5.

financing.[46]  Kang took offense, and in response informed Skinner that the parties had "lost trust in each other" and that it was "time for us to move on."[47]

On September 14, 2013, Blanch emailed Skinner regarding "how to play this thing out."[48]  Blanch schemed to cut Ajia and Henry Kang out of the deal by purchasing ViaStone through a new limited liability company, using funding from Diamond, Carter, and Aaron.[49]  Blanch and Skinner persuaded ViaStone's founder, Chow, to end his negotiations with Ajia.[50]  On September 20, 2013, Chow did just that, by having ViaStone's counsel notify Ajia's counsel that ViaStone was ending further negotiations with Ajia.[51]  The next month, Blanch, Skinner, and Diamond attended a dinner with Chow and Aaron at The Aaron Group's corporate headquarters.[52]  Diamond testified that this dinner lent significant credibility to

---

[46] *Id.*

[47] *Id.* at S0018203.

[48] JX 17.

[49] *Id.*

[50] Tr. 1052:17–1053:12 (Chow).

[51] JX 19 & 20.  ViaStone and Ajia disputed the import of the July stock purchase agreement. PTO ¶ 8.  ViaStone represented that it would return the $250,000 deposit and a $200,000 loan, and it took the position that ViaStone and Ajia had never validly entered into any agreement for the purchase of ViaStone.  JX 19.  Kang disagreed, and considered litigation against ViaStone.  *See* JX 55.  Blanch never notified Diamond of this dispute.  Tr. 26:11–27:1 (Diamond).

[52] Tr. 19:13–20:6 (Diamond).

Blanch both in the stone paper industry and in others areas, such as the cosmetics industry.[53]  Shortly thereafter, Diamond committed to invest in acquiring ViaStone.

On November 2, 2013, just as Blanch's and Skinner's negotiations with ViaStone were ramping up, Chow suddenly ceased conversations with Blanch and Skinner until they agreed to execute a confidentiality agreement.[54]  In an email to Skinner, Blanch recommended that they not sign the confidentiality agreement. Blanch indicated that he planned to ignore the request and to proceed with attempting to finish the transaction.  Blanch also indicated that, eventually, he and Skinner could potentially seek to "go straight to China and buy direct":

> Seems that this is [ViaStone's lawyer] trying to get some control in the negotiations.  This is common stuff.  I would let it glide at this point. Next steps are to get the transaction done for Diamond and Drew into the new LLC and for us to get the paperwork done between that LLC to the Ajia/Stone Paper LLC.  Then for the Stone Paper/Ajia LLC to get paperwork with Tier 1.
>
> [The ViaStone managers] are not very bright.  They are amateurs and do not seem to understand that if for any reason we pull the plug, they are back to dealing with Ajia and a lawsuit.
>
> Aaron Paper will NOT work with them if we walk away.  And we do NOT sign anything here . . . as we might need to go straight to China and buy direct.  Signing this kind of crap could give them ammunition to challenge us in that situation.[55]

---

[53] *Id.*

[54] JX 29.

[55] *Id.* (ellipsis in original).

Skinner agreed, and stated, "[a]s for China we spoke about going direct a while ago but easier said than done but I'm sure we can pull it off if what we have been told is true."[56]

Negotiations with ViaStone resumed. On December 22, 2013, Blanch notified ViaStone's managers, Michael Cheng and Jeff Chow, that "Brian and I were able to get the deal done with Drew [Aaron] and Jo[h]n Diamond."[57] According to Blanch, he "hope[d] to have paperwork" submitted to ViaStone's managers "before January 1st."[58] By this time, ViaStone's managers trusted Blanch enough to have provided him with a "viastone.net" email address.[59]

## D. The Parties Form Clovis to Purchase ViaStone.

In early 2014, Diamond, Carter, Skinner, and Blanch began preparing for the formation of Clovis to purchase ViaStone. In January 2014, Blanch and Aaron discussed Aaron's future involvement, including by investing in ViaStone and distributing its stone paper product through Aaron's entity, The Aaron Group.[60] During the same period, Blanch began holding himself out as the successful owner

---

[56] *Id.*

[57] JX 33.

[58] *Id.*

[59] *Id.*

[60] JX 592. This is an email from Aaron to Blanch, copied within an email from Skinner to Christopher Ezold, an attorney involved in the formation of Stone & Paper. JX 590. It is not clear from the record how the email was transmitted from Blanch to Skinner.

of an "environmentally friendly paper company."[61]  In an email dated January 17, 2014, Blanch wrote to a friend with an update regarding his life:

> I started a private equity fund with an old friend of mine and we have bought a[n] environmentally friendly paper company.  We hold patents that allow us to make paper from limestone (calcium carbonate), with NO pulp or water required in its production, and the paper is competitive with any pulp based product on the market (the Chinese government just built us a $250MM plant in China that produces 360MM tons annually).[62]

Blanch's autobiographical update was pure fiction.  When Blanch sent this email, he was not: (1) the cofounder of a private equity fund, (2) the purchaser of an environmentally friendly paper company, (3) the holder of patents relating to stone paper, or (4) the recipient of a $250MM paper plant in China that the Chinese government had built for his non-existent private equity fund.  At trial, Blanch characterized his email's statement regarding his ownership of an "environmentally friendly paper company" as "shorthand," called the statement that the "Chinese government . . . built us a $250MM plant in China" an "embellishment," and confessed to being "embarrassed" about it.[63]  In the same January 17, 2014 email, Blanch further represented to his friend that Metier had become a "powerful brand

---

[61] JX 40.

[62] *Id.*

[63] Tr. 714:24–19:7 (R. Blanch).

with industry credibility."[64] Less than one month later, Metier filed for bankruptcy.[65]

In February 2014, Diamond sent Skinner an email indicating that he wanted to include contractual limitations on the use of funds invested in Clovis. He sought "[c]lear language" in any limited liability company agreement "limiting the use of the capital provided by [Stone & Paper] solely to investment in the 'Viastone Business,'" defined as "the acquiring of the equity or assets of Tier1 International."[66] Skinner responded and said, "Fine with me."[67] Skinner forwarded Diamond's email to Blanch and their attorney, Robert Okulski. Blanch indicated to Skinner and Okulski that the contractual limitation was acceptable to him.[68] Okulski cautioned that Diamond's proposed language might be "too restrictive," because "a large portion of the capital is also going to be used to fund the operations of the Viastone business post-closing" and that "the funds are also to be used to cover the formation and ongoing operating costs of Clovis."[69] In response, Blanch noted that "they want to ensure the money is used for what we have stated – notably to purchase and run

---

[64] JX 40 (writing regarding Metier and stating that "Many call us the Rolls Royce or Hermes of the Beauty Industry – its nice to hear.").

[65] Tr. 155:21–156:9 (Diamond).

[66] JX 47.

[67] *Id.*

[68] JX 48 at SA026515.

[69] *Id.* at SA026514.

Tier1/ViaStone," and proposed "a small carve out regarding Clovis expenses," but otherwise providing that "money is for purchase and ongoing working capital for [ViaStone]."[70]

Blanch told Diamond that it was necessary to finalize the Clovis LLC Agreement by early March 2014 so that Clovis could purchase ViaStone before Aaron Paper issued ViaStone a "20,000 ton commitment" as its "opening order."[71] There is no evidence that Aaron or any entity affiliated with Aaron ever purchased paper from ViaStone.[72]

On or about April 4, 2014, the parties executed Clovis's LLC Agreement.[73] The LLC Agreement restricts the ability of Clovis to take any action defined as a "Major Decision" without approval in writing by Clovis's board of managers and "the Preferred Members."[74] Clovis's board of managers consisted of the two Managers, Blanch and Skinner, and Clovis's only Preferred Member was Stone &

---

[70] *Id.*; PTO ¶ 10.

[71] JX 44.

[72] *See* Tr. 721:4–22 (R. Blanch) (acknowledging that Aaron Paper did not submit any purchase order to purchase paper from Clovis).

[73] PTO ¶ 11. Blanch and Skinner signed the LLC Agreement as Managers of Clovis, Vivianna Blanch signed on behalf of Red Bridge, Skinner signed on behalf of Skinner Capital, and Diamond signed on behalf of Stone & Paper. LLC Agreement, Signature Page. The parties stipulated that, even though the LLC Agreement is dated "as of January 1, 2014," it was, in fact, executed on or about April 4, 2014. PTO ¶ 11.

[74] LLC Agreement § 5.1.

16

Paper.[75]  Thus, any "Major Decision" required Stone & Paper's written consent. Section 5.1(c) of the LLC Agreement provides that the "Major Decisions" include "[e]ngaging in any business other than the Viastone Business, including, but not limited to, the funding and purchase and operations thereof through a subsidiary."[76] "Viastone Business" is defined in the LLC Agreement as "the paper business currently conducted by Tier1 International, Inc., a California corporation that the Company is seeking to acquire through a subsidiary either pursuant to a stock or asset purchase."[77]

The LLC Agreement contains limitations on transactions between the Company and its members and managers.  Section 5.2 provides that the Company may not:

> enter into an Interested Transaction . . . unless it has first fully disclosed the terms and conditions of such Interested Transaction to the Board and the Members and the Board determines that the Interested Transaction is fair and reasonable to the Company and the terms and conditions are at least as favorable to the Company as those that are generally available from persons capable of similarly performing them and in similar transactions between parties operating at arm's length.[78]

The LLC Agreement defines "Interested Transaction" as "any transaction between a Member, a Manager or a member of the Board, or any Affiliate thereof, on the one

---

[75] PTO ¶¶ 1, 3, 6.

[76] LLC Agreement § 5.1(c).

[77] *Id.* § 1.1(kk).

[78] *Id.* § 5.2.

hand, and the Company, on the other hand."[79]  The LLC Agreement then provides that, "in the event that the Company acquires the Viastone business through a stock or asset purchase, the current Managers, directly or through their Member entities, will be actively involved in the management thereof and will receive a fee or like compensation therefor."[80]

### E.  Skinner and Stone & Paper Take a "Salary" from Clovis.

Stone & Paper initially capitalized Clovis with $3.5 million on April 8, 2014.[81] Clovis maintained a single bank account at Citibank, with Blanch, Skinner, and Diamond as the sole signers on the account.[82]  Later that month, Skinner began wiring regular payments from Clovis to Stone & Paper, Skinner Capital, and Red Bridge.[83]

Skinner requested permission from Diamond to draw a salary of $20,000 per month for work relating to Clovis.  Though Diamond did not recall specifically when he gave permission for Skinner to draw a salary from Clovis, Diamond testified that, "a few months after we had funded Clovis," he approved Skinner's requested salary

---

[79] *Id.* § 5.2.  "Member" is defined to mean "each of the Preferred Members and Common Members listed on Schedule A hereto," in addition to any future members.  *Id.* § 1.1(w).

[80] *Id.* § 5.2.

[81] PTO ¶ 12.

[82] *Id.*

[83] *Id.*; JX 503.

18

in the "spring, summer, or fall" of 2014, and he never withdrew his approval for Skinner's salary.[84]  Skinner began wiring $20,000 per month from Clovis to Skinner Capital beginning on April 18, 2014.[85]  Diamond testified that his "understanding" was that Skinner would not draw a salary for very long because he believed that the "purchase of ViaStone was imminent."[86]  Nevertheless, in July 2015, although Clovis still had not acquired ViaStone, Skinner notified Diamond that Skinner was being paid $20,000 per month by Clovis, and Diamond did not object.[87]

At around the same time that Skinner requested a salary, he and Diamond agreed that Clovis would make regular payments to Stone & Paper.  Diamond testified that Skinner approached him to propose paying Plaintiff $10,000 per month in exchange for Diamond's providing computer programming services.[88]  Diamond testified that he would have performed the computer programming services for free, but that Skinner insisted on paying the $10,000 salary to him.[89]  Diamond was never

---

[84] Tr. 45:18–46:14 (Diamond); Tr. 121:16–122:10 (Diamond).

[85] PTO ¶ 12.

[86] Tr. 46:6–14 (Diamond).

[87] JX 597; JX 604.  These documents are ambiguous, but Diamond testified that he was asking Skinner regarding his projected income from Clovis and that he did not object to Skinner's withdrawal of $20,000 per month because Skinner told him that he was working on Clovis matters.  Tr. 61:6–62:10 (Diamond).

[88] Tr. 48:6–49:11 (Diamond).

[89] Tr. 48:6–49:11 (Diamond).

19

asked to perform—and never performed—any computer programming for Clovis.[90]

Skinner testified that Diamond requested to take money out of Clovis, and Skinner agreed to $10,000 per month.[91]  Between April and December 2014, Skinner wired ten equal payments of $10,000 to Stone & Paper, until Skinner informed Diamond that Aaron wanted the payments to stop.[92]

Blanch and Skinner agreed to make $20,000 monthly payments from Clovis to Blanch as well.  But before Skinner could wire the funds, Blanch needed to create an account and a cover story.  On April 16, 2014, Blanch sent Vivianna Blanch an email directing her to open a bank account based on the following details:

> Red Bridge & Stone LLC is a consulting business: Marketing Consulting.  You have one client which will be Stone Paper Holdings LLC, a manufacturer of Paper in Asia and a DE based LLC.  You will be assisting in the building of a new brand for the business.  You will receive $20,000/month in consulting fees per a contract with Stone Paper Holdings LLC.  You need a business bank account for Red Bridge & Stone that allows for bank wires.  You will also need a checkbook and a debit card for the account under your name.[93]

Blanch's instructions to his wife were founded on pure fabrication.  There was no contract between Red Bridge or Vivianna and "Stone Paper Holdings LLC" pursuant

---

[90] Tr. 96:7–21 (Diamond).

[91] Tr. 323:22–324:11 (Skinner).

[92] Tr. 48:6–49:11 (Diamond).

[93] JX 76 (formatted).

to which Red Bridge would receive $20,000 per month in consulting fees.[94] And Vivianna Blanch admitted that she never "assist[ed] in the building of a new brand for the business."[95]

Vivianna Blanch followed her husband's instructions that day.[96] She sent an email to First Republic Bank with the subject line "Vivianna Blanch Business Account," and requested "next steps in creating a business account."[97] Vivianna Blanch informed the bank that she had "started a Marketing Consulting company," that she had "a client that will start to wire me $20,000/month in consulting fees," and that she wanted to get her account "set up as soon as possible."[98] Blanch emailed their family accountant, Spencer Barback, stating that "Viv has created a consulting company (Red Bridge & Stone, LLC) that will be working with an Asian paper manufacturer to market paper built from stone (calcium carbonate) in the US market place."[99] Blanch wrote that "Viv also has been given equity in the company," and

---

[94] Tr. 796:21–797:1 (R. Blanch); Tr. 895:3–9 (V. Blanch).

[95] Tr. 894:15–23 (V. Blanch).

[96] Richard testified that he sent this email from his joint email account with his wife. Tr. 644:7–645:11 (R. Blanch). *see also* Tr. 888:23–889:1 (V. Blanch). Richard's testimony regarding this issue is not credible. Even if it were credible, it is not legally significant because, as detailed further herein, there is other evidence that Vivianna Blanch knowingly participated in her husband's efforts to shelter funds from scrutiny.

[97] JX 74.

[98] *Id.*

[99] JX 77.

21

that "she will be receiving $20,000/month in payments per a contract to assist in marketing."[100]   Blanch copied a joint email account held by himself and Vivianna on the email.[101]

The following day, on April 17, 2014, Vivianna wrote to the bank, reiterating that she had a "client . . . ready to wire my monthly fee of $20k in.   Once I send them the bank information, they will wire it (can be done today if possible to get account opened up that fast)."[102]   The same day, Vivianna went to First Republic Bank to open up the account through a Master Signature Card and Agreement to Open Account.   In the agreement, Vivianna wrote that Red Bridge was in the business of "management consulting (including HR and Marketing)."[103]   Vivianna knew that she would not be performing any services for Red Bridge.[104]   In fact, Vivianna believed that Red Bridge had been formed to "mitigate any risks" from the Metier Action and "didn't ask too many questions."[105]   That evening, Blanch emailed Skinner asking him to "please send that wire tonight," noting that "[w]e have everything set up with First Republic and that wire confirms the account."[106]

---

[100] *Id.*

[101] *Id.*

[102] JX 81.

[103] JX 78.

[104] Tr. 895:22–896:17 (V. Blanch).

[105] Tr. 881:5–18 (V. Blanch).

[106] JX 79.

On April 18, 2014, Skinner wired $20,000 of Clovis's funds to Red Bridge. Clovis continued to wire $20,000 to Red Bridge almost every month over the following two years.[107] Between April 18, 2014 and October 5, 2016, Skinner wired a total of $797,000 to Red Bridge.[108] Red Bridge had no other sources of revenue.[109] There is no evidence in the record that Stone & Paper—through Diamond or Carter—approved the payments to Red Bridge, or that Red Bridge or Vivianna ever performed any consulting services for Clovis. Blanch and Vivianna used the funds wired from Clovis to Red Bridge for their personal expenses, including for payment of their American Express credit card, day care, babysitters, and private school.[110] Despite never having performed any services for Red Bridge or Clovis, Vivianna testified that using Red Bridge's funds for child care constituted "legitimate business expenses."[111]

In May 2014, after having made several loans to Metier, Dimaco purchased Metier out of bankruptcy and assigned its assets to a new entity named Le Maison

---

[107] PTO ¶ 12.

[108] *Id.*

[109] Red Bridge Rule 30(b)(6) Dep. 45:8–11.

[110] Tr. 932:17–936:3 (V. Blanch); JX 522; JX 140.

[111] Tr. 933:18–934:5 (V. Blanch). Richard Blanch and Vivianna Blanch often equivocated on the subject of the use of Red Bridge's funds during their testimony. *See* Tr. 923:20–926:3 (V. Blanch); Red Bridge Rule 30(b)(6) Dep. 45:21–52:19.

de Beaute ("Maison").[112]  After the acquisition, Blanch and Skinner both worked for Maison in addition to being managers of Clovis.

**F.     Richard Blanch, Brian Skinner, and Their Foray into the Stone Paper Business.**

Once Clovis was formed, Blanch and Skinner indicated to Chow that their purchase of ViaStone was imminent.  On April 14, 2014, Blanch emailed Chow and Skinner with an outline of the terms of the deal with ViaStone.[113]  The subject line of the email was "Via Stone | Deal Overview."[114]  According to Blanch, his attorneys were working on an asset purchase agreement through which "Stone & Paper Holdings LLC will buy the assets of Tier 1 for $1.25mm," Chow would receive 20% of the equity in Stone & Paper Holdings, LLC, Ajia would receive 8% of the equity in Stone & Paper Holdings, LLC, and Chow and ViaStone would make various payments to Ajia.[115]  Blanch wrote, "[w]e are close here gentlem[e]n.  Let's close this deal and go forward."  After Chow responded that he and his wife "tentatively agree[d] to the outlined overview below," Blanch responded that his "hope" was to have "legal paperwork for all next week."[116]

---

[112] Tr. 155:21–156:14 (Diamond).

[113] JX 83.

[114] *Id.*

[115] *Id.*

[116] *Id.*

24

Even though Blanch and Skinner represented to Chow that the purchase of ViaStone was imminent, Blanch and Skinner were chary of sharing any future power or control and were still considering the possibility of supplanting ViaStone as TLM's distributor. Only one month after Stone & Paper funded Clovis for the purpose of purchasing ViaStone, Blanch wrote to Okulski indicating that he was prepared to abandon the deal and "go direct to the plant" in Taiwan:

> We are not interested in giving anyone anything but passive rights. As far as I am concerned, we are being overly generous in the current deal. It is take it or leave it in regards to rights in the new company.
>
> We do not need any assets from the Chows or Henry [Kang] to make this business work. In short, we are willing to use our $1.25mm to start our own entity and go direct to the plant without the assistance of Jeff/Mike.[117]

Thus, although Blanch and Skinner continued to act as though they were interested in purchasing ViaStone,[118] they were willing to go it alone.

In June 2014, Blanch connected with Michael Fruhling, a longstanding acquaintance who specialized in business development and R&D innovation.[119] Blanch asked Fruhling for help finding a supply chain into which they could insert and scale their stone paper product.[120] Fruhling contacted Procter & Gamble,

---

[117] JX 96.

[118] *See, e.g.*, JX 91 (draft asset purchase agreement dated May 7, 2014).

[119] Tr. 555:21–556:21 (R. Blanch).

[120] Tr. 556:7–557:17 (R. Blanch).

Church & Dwight, Crayola, Unilever, Bayer, and Pfizer on Blanch's behalf.[121] During this process, Blanch repeatedly lied about who he was, who he represented, and his ability to distribute stone paper:

- In June 2014, Blanch copied Aaron on an email to Crayola proposing a meeting, representing that "[Aaron] is the head of Aaron Paper and the co-owner of Via Stone with me."[122]

- In a June 2014 email to the United States Playing Card Company, Blanch represented himself as the "CEO" of "Via Stone."[123]

- On July 14, 2014, Blanch signed a non-disclosure agreement with Fort Dearborn, a company involved in the business of corrugated packaging, as the CEO of "Tier 1 Corporation."[124]

- In September 2014, after having been put in contact with Procter & Gamble by Fruhling,[125] Blanch indicated to Proctor & Gamble that he was the "CEO" of "Via Stone/Tier 1."[126]

---

[121] Fruhling Dep. 34:16–19.

[122] JX 653.

[123] PX 1.

[124] PX 6.

[125] Fruhling Dep. 30:14–31:19.

[126] PX 4.

- In December 2014, Fruhling drafted an email for Blanch's approval indicating that "Stone and Paper Operations, LLC . . . represents the consolidation of a dozen or more tiny brands . . . that had dotted the marketplace until Blanch assumed the rights for worldwide distribution of the material from TLM."[127] According to that email, "[Blanch] purchased the Via Stone Company, whose technical and warehousing operations are based in California. He then purchased the individual distributors (and their brands) and has, in effect, shut them down."[128] Fruhling testified that he believed Blanch gave him the information contained in his draft email.[129]

Blanch's misrepresentations continued to mount. In emails addressed to Fort Dearborn discussing Unilever's supply chain, Blanch indicated that he was the CEO of "Via Stone & AaronStone."[130] Blanch was never the CEO of AaronStone.[131] Blanch told Fort Dearborn that "[t]here are over 40 patents in place that we own the rights to and we own the manufacturing in mainland China."[132] According to

---

[127] PX 7.

[128] *Id.*

[129] Fruhling Dep. 38:7–23.

[130] JX 201 at S0006615.

[131] Tr. 823:20–23 (R. Blanch).

[132] JX 201 at S0006612.

Blanch, "We are the mill owners. We are the brand owners."[133] All of this was untrue.

To prepare for a series of meetings with prospective clients, Blanch had Clovis pay $150,000 to purchase stone paper inventory from a company named Design and Source Production a/k/a Terraskin. The paper was to be used to make samples for prospective clients.[134] Chow advised Blanch not to purchase the paper because it was not coated and was unsuitable for printing.[135] Chow testified at his deposition, on behalf of ViaStone, that the stone paper purchased from Terraskin could not be sold, that it could only be used as a sample because it could damage presses, and that most of it was ultimately warehoused and recycled at his expense.[136] The Blanch Defendants submitted samples of the purchased stone paper inventory as trial exhibits.

Blanch leveraged his relationship with Fruhling into meetings with several large companies to pitch potential applications for stone paper. In doing so, Blanch made misrepresentations to his direct business contacts. Fruhling testified that he believed that Blanch was the CEO of ViaStone.[137] Blanch also lied to Aaron. In

---

[133] *Id.*

[134] PTO ¶ 18; Tr. 588:15–593:14 (R. Blanch).

[135] ViaStone Rule 30(b)(6) Dep. 48:10–51:14.

[136] *Id.* at 163:14 –169:6.

[137] Fruhling Dep. 31:13–19.

28

November 2014, Aaron sent Blanch and Skinner a list of questions regarding the source of Blanch's funds and his relationship to TLM. As to the source of funds, Blanch represented that "$3.5MM was invested by [Skinner] and myself and is given to John Diamond as a preferred return."[138]

Fruhling's efforts on behalf of Blanch led to Blanch and Skinner embarking on trial runs for stone paper products in 2015. According to Skinner:

- In or about January 2015, Blanch, Skinner, Aaron, and Chow met to run trials of stone paper for Procter & Gamble.

- In or about May 2015, Blanch, Skinner, and Chow met to run trials of stone paper for Pfizer.

- In or about July 2015, Skinner ran a trial of stone paper for Biersdorf in Germany.

- In or about October 2015, Blanch and Aaron conducted trials for a company named Dogan Group in Turkey.[139]

These trials and sales pitches were Blanch and Skinner's primary focus, and the acquisition of ViaStone was a secondary objective. When their attention finally returned to ViaStone, their concept of the deal had become unrealistic. On February

---

[138] JX 152 at S0007558.

[139] Skinner Opening Br. at 17–19. *See also* ViaStone Rule 30(b)(6) Dep. 63:6–7 ("Brian was at most all of the meetings more than Richard.").

11, 2015, Blanch informed Okulski that Blanch had refused to negotiate a settlement agreement with Kang regarding the stock purchase agreement between ViaStone and Ajia as part of Clovis's acquisition of ViaStone.[140] On May 7, 2015, a year after Blanch had told Chow that they were on the verge of closing, Blanch sent Okulski an email with new deal terms, describing them as "the deal points that make sense."[141] Blanch's new terms contained no cash consideration for the purchase of ViaStone—a significant departure from the $1.25 million in cash consideration contemplated the prior year. Okulski cautioned that the deal would make no sense for ViaStone to accept and recommended that Blanch not convey the new terms to Chow:

> 1. The structure calls for acquiring certain assets of Tierl pursuant to the existing Asset Purchase Agreement and the melding of that business into Operations. I would recommend against delivering the term sheet to Jeff [Chow] without some prefatory explanation - from a cash perspective, the Chows are going from receiving $1,000,000 (after payment of the $250,000 to [Ajia]) for the business to receiving nothing other than the additional percentage participation in the net profits of his existing accounts.[142]

It is not clear from the record whether Blanch ultimately submitted these terms to Chow, but it is apparent that Chow had come to distrust Blanch. Chow testified

---

[140] JX 181.

[141] JX 191.

[142] *Id.*

that Blanch was "not a trustworthy guy [the] more you get to know him."[143] By August 2014, Chow believed the deal with Blanch was a "scam" and that Blanch and Skinner were "a couple of scammers."[144] Chow continued to engage with Blanch and Skinner based on his desire to maintain friendly contact with Skinner.[145] Based on the record, it is also apparent that Chow sought to leverage Blanch's and Skinner's efforts to contact customers into opportunities for ViaStone.

In October 2015, a TLM representative informed Blanch that "[t]he president of TLM" was unhappy with him because he felt that Blanch had been dishonest with them.[146] TLM informed Blanch that he should discuss any further business with Chow before any further meetings with TLM.[147] Even though Blanch's relationship with Chow had soured, he reached out to Chow for help in dealing with TLM. Blanch forwarded TLM's email to Chow and asked him how he would "like to proceed regarding the email chain between TLM and us."[148] Blanch wrote: "I know you were disappointed in our conversation a few months ago and see me as the

---

[143] ViaStone Rule 30(b)(6) Dep. 129:7–19.

[144] *Id.* at 55:5–20.

[145] *Id.* at 55:5–57:5.

[146] JX 262 at S0005803.

[147] *Id.*

[148] *Id.* at S0005801.

reason for that disappointment . . . . Just want to move things forward and want us all working together. We can be a large contributor to the success of VS."[149]

Just one month later, however, Blanch had concluded that an acquisition of ViaStone "wasn't going to happen."[150] Rather than pursue selling stone paper by acquiring and operating ViaStone, which was to be the focus of Clovis, Blanch attempted to cut out Chow and ViaStone and establish a direct relationship with TLM.[151] In November 2015, Blanch reached out to TLM directly, copying Chow and Aaron, informing TLM that he was "unable to meet [Chow]'s demands for the sale price of his company" but that Aaron Paper wanted to market TLM's product in Turkey as "AaronStone Paper."[152] Blanch had made a tremendous miscalculation by underestimating TLM's loyalty to its U.S. distributor.

TLM rejected Blanch's attempt to circumvent Chow and ViaStone. TLM told Blanch that it wanted to "keep this business relationship simple" and would "only work via ViaStone as the single window contact for our business relationship."[153] In response, Blanch attempted to leverage his relationship with Aaron, arguing that

---

[149] *Id.*

[150] Tr. 816:4–8 (R. Blanch) (testifying that, by November 29, 2015, he had "determined that the acquisition of ViaStone wasn't going to happen").

[151] JX 266.

[152] JX 267.

[153] JX 274 at S0005310.

working through ViaStone was impossible because Chow had "no interest in selling product to us, or assisting us in achieving our stated goals."[154]  Blanch requested a meeting to discuss the matter further, but TLM again rejected Blanch, writing that it had a "strong relationship" with ViaStone, "so if ViaStone can not meet your needs, it would be no different for TLM."[155]  In a final effort, Blanch threatened TLM in a December 22, 2015 email.  Blanch stated that his business relationships at "Aaron Paper, Beiersdorf, Dogan, Pfizer, Unilever, Heinzel (through Aaron Paper) and many other respective clients working on stone paper trials will be put on permanent hold until further word from me."[156]  He requested that TLM and Chow "rethink" their position.[157]  Neither TLM nor Chow responded.[158]

Blanch, Skinner, and Aaron continued to search for potential customers to buy stone paper products.[159]  The record is devoid of any indication that Blanch or Skinner ever successfully sold any material amount of stone paper.  During the December 8, 2020 pre-trial conference, the Blanch Defendants argued for the first time that they had a customer for a stone paper product, therefore indicating that

---

[154] *Id.* at S0005309.

[155] *Id.* at S0005308.

[156] *Id.*

[157] *Id.*

[158] ViaStone Rule 30(b)(6) Dep. 60:4–6.

[159] JX 291.

Blanch's and Skinner's efforts were legitimate. According to the Blanch Defendants' counsel, they possessed a purchase order dated November 4, 2020 regarding a purchase of stone paper from their "first client," and they attempted to condition its production to Plaintiff before trial on Plaintiff's entry into confidentiality agreement.[160] There is no confidentiality order governing the treatment of discovery material in this action. At the pre-trial conference on December 8, 2020, the Court ordered production of the newly touted purchase order. The purchase order is for $6,810 of corrugated sheets of stone paper from an entity named Custom Liners, Inc.[161] At trial, Blanch testified that the customer reached out to him in February 2020 and purchased a trial order.[162] The Blanch Defendants argued that it was not required to produce any documents relating to this order because the discovery cutoff for requests for production was in 2020.[163]

### G. Clovis Never Acquires ViaStone, and Skinner and Blanch Drain Clovis's Funds.

Blanch and Skinner often used Clovis's funds for personal expenses. In November 2014, Blanch invested $75,000 of Clovis funds in a company named

---

[160] Pre-Trial Conference Tr. 16–18.

[161] JX 499.

[162] Tr. 847:8–848:2 (R. Blanch).

[163] Tr. 767:1–22 (R. Blanch).

34

Spangler Scientific, LLC ("Spangler").[164] Blanch testified that he told Diamond that he would be investing in Spangler and that Clovis would pay the funds to Spangler Scientific "in lieu of [Blanch] receiving management fees."[165] Skinner and Diamond testified that neither Diamond nor Carter (i.e., Stone & Paper) approved the use of Clovis's funds to invest in Spangler.[166] Blanch also used $105,000 of Clovis funds to pay his personal attorneys at the Roth Law Firm.[167] Blanch testified that this payment was out of "convenience" and that the payment was made to "replace . . . management fees that I was being paid."[168] Blanch and Skinner also caused Clovis to pay $11,510 on a bill for the Blanch Defendants' American Express card.[169] Skinner effected all of these transfers from Clovis's account.[170]

Blanch testified that, by November 29, 2015, he had "determined that the acquisition of ViaStone wasn't going to happen."[171] And by then, his effort to develop a relationship directly with TLM had also failed. At that point, Skinner and Blanch turned their attention to draining Clovis's bank account. On December 1,

---

[164] JX 503 at CITIBANK_1724; JX 510 at Spangler_40.

[165] Tr. 646:21–648:15 (R. Blanch).

[166] Tr. 63:21–64:4 (Diamond); Tr. 428:17–22 (Skinner).

[167] PTO ¶ 15; Tr. 733:5–734:1 (R. Blanch).

[168] Tr. 645:19–646:20 (R. Blanch).

[169] PTO ¶ 17.

[170] *Id.* ¶¶ 15 & 17.

[171] Tr. 816:4–8 (R. Blanch).

2015, Skinner wired Red Bridge and Skinner Capital $240,000 each.[172] Skinner and Blanch testified that this wire was made because Clovis's accountant, Richard Eisenberg, instructed Skinner to treat the following year's "management fees" as a single lump sum loan.[173] Eisenberg testified that he "received specific instructions" from both Blanch and Skinner "to treat those disbursements of $240,000 as loans" to Blanch and Skinner.[174] Eisenberg categorically denied ever instructing Blanch that "he should advance himself $240,000 as a loan rather than take 12 equal monthly loans of $20,000 from Clovis Holdings."[175]

The documentary evidence supports Eisenberg's testimony, which I find credible. On October 11, 2016, in preparation for filing Clovis's 2015 tax returns, Skinner instructed Eisenberg that "[a]ll cash to Red Bridge and Stone in 2015 and 2016 (this year for next year's taxes) should be a loan."[176] Eisenberg was concerned because he had been instructed to treat the regular $20,000 payments in 2015 as "guaranteed payments" and that he was being separately instructed to treat the $240,000 payment as a loan. He wrote, "Are you sure about this? There were payments during the year that were called guaranteed payments, and then a payment

---

[172] PTO ¶ 12.

[173] Tr. 418:3–13 (Skinner); Tr. 635:21–637:15 (R. Blanch).

[174] Tr. 1065:14–21 (Eisenberg).

[175] Tr. 1066:12–20 (Eisenberg).

[176] JX 321.

in December of $240K apiece that was called a loan. Were all payments made during the year meant to be loans?"[177] Skinner responded by stating, "Red Bridge should all be loans[,] for Skinner Capital you can leave as is. Unless you think they need to be the same."[178]

Eisenberg grew concerned. On November 20, 2016, he emailed Diamond indicating that one issue "that we never fully resolved is a request to treat the money sent by [Clovis] to [Red Bridge] during the year as a loan instead of a guaranteed payment."[179] Eisenberg notified Diamond that the payments totaled $280,000 and were made in increments of $20,000, and that Skinner was asking to recharacterize the payments as loans rather than as guaranteed payments. Eisenberg further notified Diamond that there had been another "$240,000 payment in December 2015 that has been booked as a loan."[180] Diamond responded: "If Brian wants to treat it as a loan I have no problem with it. I[s] there something something [sic] else that I am missing here?"[181]

Blanch and Skinner testified that the $240,000 was intended as an "advance" for management fees in 2016, yet they continued to wire themselves Clovis funds at

---

[177] Id.

[178] Id.

[179] JX 317.

[180] Id. (emphasis in original).

[181] Id.

an accelerated rate in the following year. Between July 13 and November 5, 2016, Skinner wired $780,000 of Clovis funds to Skinner Capital.[182] In July 2016, Skinner wired $170,000 to Red Bridge.[183] Defendants characterize the 2016 payments as loans. In total, between 2014 and 2016, Skinner wired $797,000 to Red Bridge and $1,482,500 to Skinner Capital from Clovis's bank account.[184]

## H. The Accounting Treatment of the Payments to Skinner Capital and Red Bridge Raises Questions and Triggers Litigation.

In 2017, Skinner directed Eisenberg to treat the $1,020,000 disbursed in 2016 to Red Bridge and Skinner Capital as loans.[185] Eisenberg requested "loan documents evidencing the loans and the repayment terms," and documentation of the "pre-2016 loans."[186] Skinner then sent Eisenberg three unsigned promissory notes (the "Promissory Notes"). The first Promissory Note is between "Clovis, LLC" and Red Bridge, is dated December 31, 2015, and provides for a loan of $240,000 to Red Bridge with 2% interest due on the last business day of 2030.[187] The second Promissory Note is between "Clovis, LLC" and Red Bridge, is dated December 31,

---

[182] PTO ¶ 12.

[183] *Id.*

[184] *Id.*

[185] JX 370.

[186] *Id.* Eisenberg also inquired as to the credit card expenditures from the AMEX Account. *Id.* Skinner advised that all of the credit card expenditures were "all business related," JX 375.

[187] JX 402.

2016, and provides for a loan of $360,000 to Red Bridge with the same interest rates and maturity date as the first Promissory Note.[188] The third Promissory Note is between "Clovis, LLC" and Skinner Capital, is dated December 31, 2016, and appears to provide for a loan of $660,000 to Skinner Capital with the same interest rates and maturity date as the first Promissory Note.[189] This Promissory Note contains an unedited remnant from the second Promissory Note because it provides for a loan with the principal sum of "THREE HUNDRED SIXTY THOUSAND DOLLARS ($660,000.00)."[190]

Eisenberg's accounting firm refused to prepare Clovis's 2016 tax returns and terminated Clovis as a client.[191] Skinner attempted to work with Citrin Cooperman, a different accounting firm, in order to file Clovis's 2016 tax return. In doing so, he forwarded the Promissory Notes he had sent to Eisenberg and advised Citrin Cooperman to "[dis]regard the note for Skinner Capital" because "the note is wrong as some of it is income not a note."[192] Skinner also informed Citrin Cooperman that the 2015 tax returns were erroneous and indicated that $310,000 of the payments

---

[188] JX 403.

[189] JX 401.

[190] *Id.*

[191] JX 380.

[192] JX 391.

previously labeled as loans should have been income.[193] Diamond testified that, in February and March 2018, in connection with preparing Clovis's 2017 tax return, Citrin Cooperman notified Diamond that Skinner was attempting to recharacterize an additional $295,000 in loans from Clovis to Skinner Capital as income.[194]

In February 2018, in connection with preparing Clovis's 2017 tax return, Skinner instructed Citrin Cooperman to convert half of Skinner Capital's loans into guaranteed payments.[195] To Skinner's and Blanch's consternation, Citrin Cooperman copied Diamond on the response.[196] Diamond objected to Skinner's directions, and he requested that Citrin Cooperman provide him financials and loan documentation and that they not file any tax returns until he had had a chance to review the documents.[197] On May 18, 2018, Diamond made a formal request on behalf of Stone & Paper to inspect Clovis's books and records under the LLC Agreement and 6 *Del. C.* § 18-305.[198] Rather than waiting to receive any documents, however, Stone & Paper filed the complaint in this action on May 31, 2018.

---

[193] JX 406.

[194] Tr. 86:10–88:23 (Diamond).

[195] JX 413.

[196] JX 414 (email from Blanch to Skinner: "FYI, [Citrin Cooperman] add[ed] John Diamond. I will take that up with [Citrin Cooperman].").

[197] JX 416.

[198] JX 435.

**I. Skinner Uses the Diamond Carter Trading American Express Account and Causes Clovis to Pay for the Milton Berg Newsletter.**

Diamond Carter Trading had a credit card account with American Express (the "AMEX Account"). The AMEX Account was in Carter's name and was guaranteed by Carter personally,[199] but Diamond, Carter, and Skinner each had individual cards on the account.[200] As COO of Diamond Carter Trading, Skinner processed the bulk of the transactions with his card.[201] Soon after Clovis was formed, Skinner asked to use the AMEX Account for Clovis expenses. Diamond and Carter permitted Skinner to use his card on the AMEX Account for Clovis expenses on the condition that Clovis pay for its share of the charges on the AMEX Account.[202] This agreement was not made in writing.[203]

The monthly AMEX Account statements all generally display similar spending patterns by the three cardholders. Diamond charged his monthly internet bill to the AMEX Account and made occasional smaller transactions. In one outlier purchase, from November 2016, Diamond spent $1,695.98 to buy a laptop computer

---

[199] Tr. 307:7–308:9 (Skinner).

[200] Tr. 437:19–23 (Skinner).

[201] Tr. 171:5–21 (Diamond); Tr. 213:15–215:24 (Diamond); Tr. 994:2–995:21 (Carter).

[202] Tr. 14:5–15:16 (Diamond); Tr. 235:2–11 (Diamond).

[203] Tr. 995:18–21 (Carter).

at Best Buy.[204]  Diamond testified that all of these expenses were related to his trading business and that he never put personal expenses on the AMEX Account.[205]

Carter also used his card for miscellaneous transactions.  He also used the card to pay $28,000 to his personal accountant in October 2016.  Carter testified that the charge to the accountant and all other charges on his card were business expenses.[206]

The vast majority of the expenses on the AMEX Account were Skinner's. While Diamond's and Carter's monthly purchase totals varied from a few hundred to a few thousand dollars, Skinner routinely charged tens of thousands of dollars to the AMEX Account.  Skinner's more frequent usage was not unexpected to the parties, as he was the COO of Diamond Carter Trading and a managing member of Clovis.  Some of Skinner's transactions appear to have been business-related, such as subscriptions for domain names, trading services, and the Amazon servers that Diamond's entities shared.[207]  Most of Skinner's transactions related to travel, transportation, restaurants, and entertainment.[208]  Skinner testified that some of these latter transactions were business expenses that he incurred while visiting employees

---

[204] JX 565.

[205] Tr. 174:9–175:10 (Diamond).

[206] Tr. 996:4–19 & 1015:20–1016:11 (Carter).

[207] Tr. 296–302 (Skinner); Tr. 439–40 (Skinner).

[208] *See generally* JXs 531–579 (AMEX Account monthly statements from January 2, 2014 to January 2, 2018).

of ViaStone or Maison de Beaute.[209] He also testified that high-level employees of Maison de Beaute charged their Uber rides to the AMEX Account.[210] Other transactions, however, are not defensible as business expenses. For example, in 2014 alone, Skinner spent over $100,000 going to strip clubs by himself.[211] Nevertheless, Skinner testified, "I kind of put whatever I wanted on the card. [The accountant] expensed it as a business expense, so it's a business expense."[212]

Skinner testified that he was the only cardholder to put charges for Clovis on the AMEX Account.[213] Because the AMEX Account was being used for both Clovis and Diamond Carter Trading business, Skinner would inform the accountants each year of how the charges should be allocated between the two entities.[214] For fiscal year 2014, Skinner sent to Eisenberg a spreadsheet entitled "clovis expenses on dct card.xls".[215] In a tab labeled "Total Clovis", the spreadsheet listed 169 transactions

---

[209] Tr. 302:5–303:24 (Skinner).

[210] Tr. 304:1–19 (Skinner).

[211] On April 12, 2014, Skinner charged $37,306.81 to the AMEX Account on behalf of Clovis. JX 649. The AMEX Account records for 2014 indicate that Skinner incurred an additional $26,616.73 at strip clubs between January 7, 2014 and April 5, 2014. *Id.* Skinner testified that he frequented the strip clubs by himself. Tr. 452:13–16 (Skinner).

[212] Tr. 438:2–5 (Skinner).

[213] Tr. 436:16–437:3 (Skinner).

[214] Tr. 305:3–306:9 (Skinner) ("[W]e really didn't itemize all the charges as to which entity they went to until it was time to work with Mr. Eisenberg at the end of the year.").

[215] JX 648.

made by Skinner in 2014, totaling $175,103.97.[216]   Many of the transactions

predated Clovis's April 2014 capitalization.  For fiscal year 2016, Skinner informed

the accountants that the charges on the AMEX Account totaled approximately

$407,000, with "$308,650.90 going to Clovis [and] $98,163.84 going to DCT."[217]

Skinner then followed up with a spreadsheet reflecting similar totals for each of

Clovis and Diamond Carter Trading, broken down into specific categories.[218]  For

fiscal year 2017, Skinner sent his accountants a year-end summary for Clovis from

American Express.[219]   The summary shows that total charges in 2017 were

$51,698.61, a significant decline from prior years.[220]   Not including fiscal year

2015,[221] Skinner told Clovis's accountants to allocate a total of $535,453.48 of the

charges on the AMEX Account to Clovis.

---

[216] JX 649.

[217] JX 362.

[218] JX 363.

[219] JX 408 ("[A]attached is tax year 2017 Clovis Amex . . . .  All of the Amex charges here were paid by Clovis NOT Diamond Carter Trading for 2017.").

[220] JX 409.

[221] The record does not indicate that Skinner or anyone else instructed Clovis's accountants as to how the 2015 AMEX Account charges should be allocated between Clovis and Diamond Carter Trading.  The AMEX Account statements from 2015 generally follow the pattern as the charges in other years, with Skinner charging tens of thousands of dollars each month and with most transactions relating to travel, transportation, and restaurants. *See* JXs 544–555.

Skinner testified that the allocation of charges on the AMEX Account did not always reflect the allocation of payments to the AMEX Account. For example, when Diamond Carter Trading's checking account was low on funds after its brokerage account closed in 2016,[222] Skinner paid for all charges out of Clovis's checking account.[223] Diamond testified that Diamond Carter Trading should have incurred very few charges after its brokerage account closed.[224] Skinner testified that Clovis's funds were used to pay Diamond Carter Trading's American Express card because Diamond did not care which entity paid it, because all the money originated from Diamond.[225] In total, from August 6, 2014 through September 21, 2017, Clovis paid $510,124.35 to the AMEX Account.[226]

In 2016, Skinner also used Clovis's funds to pay for the Milton Berg newsletter, an investment newsletter that provided stock trading recommendations.[227] Skinner and Diamond reviewed the newsletter as part of their trading business.[228] In 2016, Diamond Carter Trading had a bill from the publisher

---

[222] *See* Tr. 236:4–237:24 (Diamond).

[223] JX 408 ("All of the Amex charges here were paid by Clovis NOT Diamond Carter Trading for 2017."); Tr. 305:3–306:9 (Skinner).

[224] Tr. 237:2–8 (Diamond).

[225] Tr. 305:3–306:9 (Skinner).

[226] PTO ¶ 16.

[227] Tr. 89:15–90:16 (Diamond).

[228] Tr. 163:3–18 (Diamond).

45

of the Milton Berg newsletter for $21,000.[229]  At the same time, Clovis purportedly owed money to Diamond Carter Trading for having underpaid its share of the charges on the AMEX Account.[230]  Diamond and Skinner decided that Clovis would pay the bill for the Milton Berg newsletter as a way to reduce Clovis's debt to Diamond Carter Trading.[231]  Skinner caused Clovis to pay the $21,000 bill on August 31, 2016.[232]

### J.  Procedural History

On May 31, 2018, Stone & Paper filed the Complaint initiating this action against the Blanch Defendants, Skinner, and Skinner Capital.[233]  The defendants moved to dismiss the Complaint, and this court denied the defendants' motion to dismiss in a May 31, 2019 Memorandum Opinion (the "2019 Memorandum Opinion").[234]  On July 24, 2019, the Blanch Defendants and Clovis filed counterclaims against Stone & Paper and third-party claims against a plethora of defendants:  Diamond Carter Trading, JAD Trading, LLC, (another entity associated

---

[229] Tr. 424:23–426:10 (Skinner).

[230] Tr. 89:24–90:10 (Diamond).

[231] They dispute who first raised the idea.  Diamond testified that Skinner proposed that Clovis pay the bill, while Skinner testified that Diamond asked him to pay the bill.  *Compare* Tr. 90:2–16 (Diamond), *with id.* 425:4–426:10 (Skinner).

[232] JX 503 at CITIBANK_001767.

[233] Dkt. 1.

[234] *See Stone & Paper Inv'rs, LLC v. Blanch*, 2019 WL 2374005 (Del. Ch. May 31, 2019).

with Diamond), Diamond and his wife, Kanokpan Khumpoo, and Carter and his wife, Elizabeth Carter (collectively, the "Diamond Carter Defendants"); as well as Eisenberg, the accounting firm Eisenberg & Blau, CPAs, P.C., and its successor firm, DDK & Company, LLP (collectively, the "Eisenberg Defendants").[235]  On August 23, 2019, Stone & Paper and the Diamond Carter Defendants moved to dismiss the counterclaims and third-party claims.  In a June 29, 2020 Memorandum Opinion (the "2020 Memorandum Opinion"), the court dismissed all third-party claims and all counterclaims except for the claims of breach of the LLC Agreement and unjust enrichment (in part) against Stone & Paper.[236]

Shortly before trial, on September 22, 2020, the defendants again amended their complaint to assert new counterclaims and third-party claims.[237]  On November 18, 2020, the court entered an order dismissing two of those claims and severing four others from trial.[238]  Those claims are not considered in this opinion.

## II.    ANALYSIS

This opinion first addresses Stone & Paper's claims, followed by Clovis's remaining counterclaims.

---

[235] Dkt. 64.  The Eisenberg Defendants were not served with the counterclaim and third-party complaint.

[236] *See Stone & Paper Inv'rs, LLC v. Blanch*, 2020 WL 3496694 (Del. Ch. June 29, 2020).

[237] Dkt. 221.

[238] *See* Dkt. 293.

## A.    Plaintiff's Affirmative Claims

Plaintiff's post-trial briefing focuses on five claims:  (1) breach of the LLC Agreement by Blanch and Skinner; (2) breach of fiduciary duties by Blanch and Skinner as managers of Clovis; (3) fraudulent inducement and fraudulent concealment of misconduct by Skinner, Red Bridge, and Skinner Capital; (4) civil conspiracy by Skinner Capital, Red Bridge, and Vivianna Blanch; and (5) aiding and abetting breach of fiduciary duty and fraud by Skinner Capital, Red Bridge, and Vivianna Blanch.  Plaintiff further argues that Vivianna Blanch should be held liable for any judgment against Red Bridge on an alter ego theory.  Based on these claims, in total, Plaintiff seeks an award of $3.4 million plus pre- and post-judgment interest and an order denying Defendants the ability to share in any recovery by Clovis.[239]

### 1.    Breach of Contract

Plaintiff alleges that Blanch and Skinner, as managers of Clovis, breached the LLC Agreement.  The elements of a breach of contract claim are:  (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages arising from the breach.[240]  Plaintiff must demonstrate each element by a preponderance of the evidence.  *Dieckman v. Regency GP LP*, 2021 WL 537325,

---

[239] Pl.'s Post-Tr. Opening Br. 60.

[240] *Zayo Group, LLC v. Latisys Hldgs., LLC*, 2018 WL 6177174, at *10 (Del. Ch. Nov. 26, 2018); *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

at *18 (Del. Ch. Feb. 15, 2021). "Proof by a preponderance of the evidence means proof that something is more likely than not." *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *12 (Del. Ch. Sept. 10, 2018) (internal citations omitted). Defendants bear the burden of proof on affirmative defenses to the breach of contract claim and must prove them by a preponderance of the evidence. *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv., LLC*, 2018 WL 3326693, at *2 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019). Defendants do not dispute that the LLC Agreement is a valid contract, and the first element is satisfied.

When construing and interpreting a limited liability company agreement, a court applies the same principles that are used when construing and interpreting other contracts. *Godden v. Franco*, 2018 WL 3998431, at *8 (Del. Ch. Aug. 21, 2018). "'Delaware adheres to the objective theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party.'" *Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)); *accord Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014). When a contract's language is clear and unambiguous, the Court will give effect to the plain meaning of the contract's terms and provisions. *Osborn*, 991 A.2d at 1159–60. The

contract is to be read as a whole, giving effect to each term and provision, so as not to render any part of the contract mere surplusage. *Id.* at 1159.

### a. Section 5.1

Section 5.1 of the LLC Agreement provides that "no action shall be taken with respect to a ['Major Decision'] without approval in writing by the Board and the Preferred Members."[241] One of the Major Decisions is defined to be "[e]ngaging in any business other than the Viastone Business, including, but not limited to, the funding of the purchase and operations thereof through a subsidiary."[242] "Viastone Business" is defined as "the paper business currently conducted by Tier1 International, Inc., a California corporation that the Company is seeking to acquire through a subsidiary either pursuant to a stock or asset purchase."[243] This definition of "Viastone Business" differed from Diamond's original proposal, which would have defined the term more narrowly to mean "the acquiring of the equity or assets of Tier1 International."[244]

Plaintiff claims that Blanch and Skinner breached Section 5.1 of the LLC Agreement by conducting stone paper trials, working to develop a stone paper market in Turkey, purchasing Terraskin paper inventory, seeking to work directly

---

[241] LLC Agreement § 5.1.

[242] *Id.* § 5.1(c).

[243] *Id.* § 1.1(kk).

[244] JX 47.

with TLM, and working on behalf of a separate entity named AaronStone without obtaining Plaintiff's written consent.[245] Plaintiff construes the contract too narrowly. The LLC Agreement required Plaintiff's written consent if the managers of Clovis engaged in any business other than the paper business "currently conducted by" ViaStone.[246] The LLC Agreement does not require that Clovis must purchase ViaStone by a certain date or that Clovis's funds must first be spent on the purchase of ViaStone. The terms of the LLC Agreement do not require consent to engage in activities in furtherance of ViaStone's business. Before Blanch and Skinner determined that purchasing ViaStone was no longer possible, they were attempting to create demand for ViaStone's stone paper products with a number of prospective customers.[247] ViaStone's manager, Chow, was directly involved in Blanch's and Skinner's efforts to increase customer demand for ViaStone's products.[248] Blanch told Diamond that Blanch and Skinner were working on paper trials, and Diamond

[245] Pl.'s Opening Post-Tr. Br. 26–27.

[246] LLC Agreement § 1.1(kk).

[247] *See* JX 653, PX 1, PX 4, PX 6, PX 7.

[248] For example, Chow "would constantly introduce [Skinner] to new players" in the stone paper industry. Tr. 271:23–272:1 (Skinner). Chow also attended a meeting at a stone paper mill in China with Blanch, Skinner, a representative of Aaron Paper, and potential customers from Turkey. Tr. 528:1–5 (R. Blanch); Tr. 534:13–21 (R. Blanch); Tr. 270:24–271:2 (Skinner).

did not object.[249] That conduct readily constituted "engaging" in the "paper business [then] currently conducted by . . . [the] corporation that [Clovis] is seeking to acquire."[250] Plaintiff has not proven that Blanch and Skinner, from the outset, never intended for Clovis to purchase ViaStone. I find that for at least some period of time before and after Clovis's formation, Blanch and Skinner engaged in genuine—though failed—negotiations with Chow to acquire the ViaStone business.[251] Plaintiff has therefore not proven by a preponderance of the evidence that the entirety of Blanch's and Skinner's general business conduct in the furtherance of ViaStone's business breached Section 5.1.

The analysis is different with respect to Blanch's and Skinner's work relating to stone paper products after November 2015. Although Blanch and Skinner started out with the purpose of having Clovis acquire ViaStone, there came a point in time when they no longer harbored a legitimate interest in purchasing ViaStone. That evolution is well documented, as Blanch attempted an end run around Chow and ViaStone, seeking to develop a direct pipeline to TLM with the ambitious goal of establishing their own entity with the assistance of Aaron. It is difficult to precisely

---

[249] *See* JX 170 (May 5, 2015 email from Blanch to Diamond, noting that "Skinner and I are in VA the next few days working on paper trials for Crayola, P&G, Pfizer and a slew of other clients").

[250] LLC Agreement §§ 1.1(kk), 5.1(c).

[251] *See, e.g.*, JX 191 (May 6, 2015 email from Blanch to Okulski, proposing terms for an acquisition of ViaStone).

pinpoint when Blanch and Skinner were no longer devoting their time, and spending Clovis's funds, to acquire the ViaStone business. But the record conclusively establishes, by Blanch's own admission, that by November 29, 2015 he had "determined that the acquisition of ViaStone wasn't going to happen."[252] On November 29, 2015, Blanch and Skinner sent an email to TLM, in which they sought to work directly with TLM to distribute TLM's stone paper in Turkey under the name "AaronStone Paper."[253] The email also noted that they and ViaStone had "agreed to not work together at this time."[254] That email constituted a breach of Section 5.1. At that point, Blanch and Skinner were using the Company and its resources to "[e]ngag[e] in [a] business other than the Viastone Business"—namely, the AaronStone business.[255] The AaronStone business was not the "Viastone Business." Once Blanch and Skinner knew that purchasing ViaStone was no longer an option, any action or commitment of Clovis resources to any business was action that required Stone & Paper's written approval. Blanch admitted that he had no written approval from Stone & Paper to do any business other than to buy ViaStone.[256] Plaintiff has therefore proven by a preponderance of the evidence that

---

[252] Tr. 816:4–8 (R. Blanch).

[253] JX 267.

[254] *Id.*

[255] LLC Agreement § 5.1(c).

[256] Tr. 731:7–13 (R. Blanch).

53

Blanch and Skinner breached Section 5.1 of the LLC Agreement to the extent discussed herein.

### b. Section 5.2

Section 5.2 governs transactions between Clovis and its managers and members, defined as "Interested Transactions." An Interested Transaction is "any transaction[]" between Clovis and its own managers, members, or their affiliates, "including, without limitation, . . . any transaction evidencing a loan (or the forgiveness of a loan)."[257] Interested Transactions are prohibited under the LLC Agreement unless (1) the Company "first fully disclose[s] the terms and conditions" of the transaction to the Board and the members, and (2) the "Board determines that the Interested Transaction is fair and reasonable to the Company and the terms and conditions are at least as favorable to the Company as those that are generally available from persons capable of similarly performing them and in similar transactions between parties operating at arm's length."[258] The court previously held that Plaintiff's claims under Section 5.2 are direct claims.[259]

Plaintiff argues that every payment from Clovis to Skinner Capital and Red Bridge was an impermissible Interested Transaction under Section 5.2 of the LLC

---

[257] LLC Agreement § 5.2.

[258] *Id.* § 5.2.

[259] 2019 Memorandum Opinion, 2019 WL 2374005, at *4.

Agreement. Defendants generally characterize these payments as either management fees or loans. The record lacks reliable documentary evidence supporting these characterizations. On the contrary, Blanch and Skinner attempted to characterize payments from Clovis to Red Bridge and Skinner Capital with whatever label would be most advantageous to them at the moment. Regardless, because the purported management fees (or salaries) and loans present different legal and factual issues, this opinion addresses Defendants' contentions regarding the purported management fees first, followed by the loans.

### i. The Management Fees

Blanch and Skinner contend that Red Bridge and Skinner Capital were entitled to the $20,000 per month they took from Clovis beginning in April 2014 (the "Management Fees"). The record reflects that Clovis paid Skinner Capital and Red Bridge the Management Fees for twenty months, from April 2014 through November 2015, for a total of approximately $400,000 each.[260] Defendants' assertion that the Management Fees were part of a "salary" or a "guaranteed payment" is not justified by reference to any contract between Clovis and Skinner Capital or Red Bridge. An Interested Transaction is "any transaction between a

---

[260] PTO ¶ 12. The regular monthly payments were occasionally interspersed with extra payments, and there were a few months were Red Bridge received less than $20,000. To be exact, between April 2014 and November 2015, Skinner Capital received $462,500 and Red Bridge received $387,000. *Id.* As discussed below, the wires to Red Bridge were not the only Management Fees that the Blanch Defendants received.

member, a manager, . . . or any Affiliate thereof, on the one hand, and the Company, on the other."[261]   Furthermore, Section 5.2 of the LLC Agreement specifically provides that, "in the event that the Company acquires the Viastone business . . . , the current managers, directly or through their respective Member entities, will be actively involved in the management thereof and will receive a fee or like compensation therefor."[262]   Because Clovis did not acquire ViaStone, Blanch and Skinner would have been entitled to the Management Fees only if they had satisfied the approval requirements of Section 5.2.

Defendants argue that the Management Fees were fully disclosed and that Plaintiff otherwise acquiesced to the Management Fees.  To prove their affirmative defense of acquiescence, Defendants must prove by a preponderance of the evidence that Plaintiff had "full knowledge of [its] rights and the material facts," and "(1) remain[ed] inactive for a considerable time; (2) freely [did] what amount[ed] to recognition of the complained of act; or (3) act[ed] in a manner inconsistent with the subsequent repudiation, which le[d] the other party to believe the act ha[d] been approved." *Basho*, 2018 WL 3326693, at *41 (internal citations omitted).

**Payments to Red Bridge.**  The Blanch Defendants did not "first fully disclose[] the terms and conditions" to Plaintiff before sending the Management

---

[261] LLC Agreement § 5.2.

[262] *Id.*

Fees to Red Bridge, as required by Section 5.2.[263] The Blanch Defendants failed to cite any documentary evidence indicating that Plaintiff approved the Management Fees to Red Bridge before the Management Fees were paid. Diamond, Plaintiff's principal, did not recall discussing a salary for Blanch and said he did not approve one.[264] The Blanch Defendants argue that Diamond was aware of the Management Fees to Red Bridge because Eisenberg emailed Diamond about the Management Fees on November 20, 2016,[265] but the email does not suggest that Diamond had at any time previously approved the Management Fees to Red Bridge. Diamond credibly testified that he would not have approved a salary to Blanch in the amount of $20,000 per month because Diamond did not have any relationship with Blanch, and Blanch was already drawing a full-time salary as CEO of Metier, which Diamond had purchased out of bankruptcy.[266] The Management Fees to Red Bridge were therefore not "first fully disclosed" to Plaintiff, as required by Section 5.2.

The record lacks any evidence that Blanch and Skinner, as managers of Clovis, met the other procedural requirements of Section 5.2. Blanch and Skinner never determined that the Management Fees were "fair and reasonable to the

---

[263] *Id.*

[264] Diamond Dep. 86:23–87:5; Stone & Paper Rule 30(b)(6) Dep. (Diamond) ("I don't recall being told or asked for Mr. Blanch to be paid a salary because I would not have approved it.").

[265] JX 317.

[266] Tr. 46:15–47:11 (Diamond).

Company," or that "the terms and conditions" of the Management Fees were "at least as favorable to the Company as those that are generally available from persons capable of similarly performing them and in similar transactions between parties operating at arm's length."[267] Defendants do not argue otherwise. Indeed, the record reflects that Blanch and Skinner were generally unconcerned with corporate formalities or fairness to Clovis. Thus, because the Management Fees were paid to Red Bridge before disclosure to Plaintiff as a member of Clovis and without any determination that the Management Fees were "fair and reasonable," Plaintiff has proven by a preponderance of the evidence that the Management Fees to Red Bridge breached Section 5.2 of the LLC Agreement.[268]

The Blanch Defendants have not proven that Plaintiff acquiesced to the Management Fees to Red Bridge. The only evidence cited by the Blanch Defendants in support of this argument is the November 2016 email between Eisenberg and Diamond. In that email, Eisenberg notified Diamond that Clovis had paid $280,000 to Red Bridge in 2015; that the payments were principally made through monthly disbursements of $20,000; that they were previously treated as "guaranteed payments"; and that Skinner had requested that the payments be recharacterized as

---

[267] LLC Agreement § 5.2.

[268] There is no evidence that the Management Fees deposited in Red Bridge's new checking account were paid pursuant to an unwritten consulting agreement with Vivianna Blanch, as Blanch and Vivianna Blanch represented to others. *See* JX 81.

"loans."[269]   Eisenberg also notified Diamond about a December 2015 payment of $240,000 that had already been booked as a loan.  Diamond agreed with Skinner's requested treatment of the payments, stating that if "Brian wants to treat it as a loan I have no problem with it."[270]  Diamond testified that Skinner sought to affirmatively dissuade him from confronting Blanch about the payments.[271]

For at least two reasons, the November 2016 email does not support a conclusion that Plaintiff acquiesced to the Management Fees paid to Red Bridge because Plaintiff did not have full knowledge of the material facts about the payments.  First, Diamond did not have full knowledge of the material facts about the purpose of the payments or the fact that the payments began back in April 2014.  Diamond's email indicates that he lacked knowledge when he added, "[is] there something [] else that I am missing here?"[272]  The November 2016 email exchange occurred almost a year after the last of the Management Fees were paid, which further suggests that Diamond was not kept informed of the material facts.

Second, Eisenberg's November 2016 email cannot establish that Diamond had full knowledge of the material facts because the $240,000 paid to Red Bridge was not, in fact, a loan.  Apart from after-the-fact justifications for payment of the

---

[269] JX 317.

[270] *Id.*

[271] Tr. 124:9–125:24 (Diamond).

[272] JX 317.

59

Management Fees, there is no indication that Clovis can contractually demand repayment of the Management Fees from Red Bridge or that the $240,000 paid to Red Bridge or the Management Fees were otherwise loans. There is no indication as to what the loan terms would be with respect to the Management Fees. That is because recharacterizing the Management Fees as a loan was a fabrication. Plaintiff could not validly acquiesce to a loan that was not a loan. Nor did Diamond know at the time of the November 2016 email that Skinner and Blanch had abandoned efforts to acquire ViaStone and had breached the LLC Agreement. Because Plaintiff did not have "full knowledge of [its] rights and the material facts,"[273] Plaintiff could not have acquiesced to the payment of the Management Fees to Red Bridge through the November 2016 email.

The Management Fees to Red Bridge also include Clovis's $75,000 payment to Spangler and Clovis's $105,000 payment to the Roth Law Firm. The investment in Spangler was made on behalf of Blanch, and Blanch and Skinner both testified that they used Clovis's funds to make the investment "in lieu of [Blanch] receiving management fees."[274] Similarly, the payment to the Roth Law Firm was to pay for Blanch's personal attorney, and Blanch and Skinner both testified that they paid Blanch's legal bills with Clovis's funds "in []place of management fees that [Blanch]

---

[273] *Basho*, 2018 WL 3326693, at *41.

[274] Tr. 414:11–24 (Skinner); Tr. 646:21–648:15 (R. Blanch).

was being paid."[275] Thus, both of these payments were among the Management Fees to Red Bridge that violated Section 5.2.

**Payments to Skinner Capital.** Diamond testified that, in the spring or summer of 2014, he approved a salary to Skinner in the amount of $20,000 per month after Skinner informed him that operating Clovis had effectively "turned into . . . a full time job."[276] The Management Fees to Skinner Capital began on April 18, 2014, just two weeks after Clovis was funded.[277] As with the payments to Red Bridge, however, there is no evidence that Clovis's Board determined that the Management Fees paid to Skinner Capital were fair and reasonable to Clovis.

Even if payment of the Management Fees to Skinner Capital would have breached Section 5.2, Skinner has proven that Plaintiff acquiesced to the payment of the Management Fees to Skinner Capital. Plaintiff's principal, Diamond, consented to their payment shortly after Clovis was funded. In its post-trial briefing, Plaintiff acknowledges that "Diamond agreed to a request by Skinner to temporarily be paid a monthly salary from Clovis."[278] In addition, in July 2015, Skinner notified Diamond that his income from Clovis was $20,000 per month,[279] and there is no

---

[275] Tr. 326:19–327:1 (Skinner); Tr. 645:19–646:20 (R. Blanch).

[276] Tr. 45:18–46:14 (Diamond); Tr. 121:16–122:10 (Diamond); Diamond Dep. 85:8–86:22.

[277] PTO ¶ 12.

[278] Pl.'s Post-Tr. Opening Br. 21.

[279] JX 595; JX 597; JX 604.

61

indication that Diamond ever objected to the payment of the Management Fees to Skinner. Plaintiff argues that Diamond's agreement to the Management Fees to Skinner was made in "reasonable reliance on Skinner's knowingly false representations that the ViaStone acquisition was imminent and that Skinner was working 'full time' for Clovis."[280] Plaintiff's argument fails because there is no indication that Diamond lacked knowledge of the material facts regarding the monthly payments to Skinner. At least through July 2015, Diamond knew that Skinner was receiving Management Fees even though ViaStone had not been acquired, and he never sought to end regular payment of Management Fees to Skinner Capital. Thus, Plaintiff had "full knowledge of [its] rights and the material facts" regarding the Management Fees payments to Skinner Capital and nevertheless "remain[ed] inactive for a considerable time." *Basho*, 2018 WL 3326693, at *41. Skinner has therefore proven by a preponderance of the evidence that Plaintiff acquiesced to the payment of $400,000 to Skinner Capital in Management Fees.[281]

---

[280] Pl.'s Post-Tr. Opening Br. 21.

[281] PTO ¶ 12. Although Skinner Capital received $462,500 in Management Fees between April 2014 and November 2015, the record only supports a finding that Diamond acquiesced to payments of $20,000 per month, for a total of $400,000 over the twenty-month period.

### ii.  The Purported Loans

In December 2015, after Blanch and Skinner had determined that purchasing ViaStone was no longer possible, Clovis ceased to wire the monthly Management Fees and instead wired Red Bridge and Skinner Capital $240,000 each.[282]  In 2016, Skinner wired $780,000 to Skinner Capital, consisting of six wires of $120,000 each and one wire of $60,000.[283]  Skinner also wired $170,000 to Red Bridge in two payments of $120,000 and $50,000, respectively.[284]  Collectively, these payments are described in this opinion as the "Purported Loans" because Defendants characterize these payments as loans or advances of management fees.

The Purported Loans are breaches of Section 5.2 of the LLC Agreement. They are impermissible Interested Transactions because they are transactions between Clovis and its own managers.  Section 5.2 defines "Interested Transaction" to include "any transaction evidencing a loan" to a manager or a manager's affiliate. Defendants cite no evidence indicating that the Purported Loans were pre-approved by Clovis's members, including Plaintiff.  Blanch and Skinner cite no evidence that they ever made any determination regarding the fairness and reasonableness of the

---

[282] PTO ¶ 12.

[283] *Id.*

[284] *Id.*

Purported Loans as required by Section 5.2 of the LLC Agreement. Defendants do not argue that the Purported Loans complied with Section 5.2.

The Blanch Defendants argue, without citation to legal authority, that Plaintiff's claims regarding the Purported Loans are not ripe because the Promissory Notes are not due until 2030.[285] They also argue that Diamond acquiesced to the Purported Loans through his November 2016 email exchange with Eisenberg.[286] Both arguments fail. The Promissory Notes are no defense to Plaintiff's claim for breach of the LLC Agreement. They are sham documents that were generated in response to Eisenberg's request for loan documentation. The Promissory Notes purport to reflect loans from Clovis to Red Bridge in the amount of $240,000 and $360,000, and a loan from Clovis to Skinner Capital in the amount of $660,000, with 2% interest rates and a maturity date at the end of 2030.[287] The Promissory Notes are not executed.[288] Skinner testified that he prepared the Promissory Notes after the funds had already been paid to Skinner Capital and Red Bridge.[289] The Promissory Notes bear dates indicating they were created after the Purported Loans

---

[285] Blanch Defs.' Post-Tr. Ans. Br. 12, 28. The Blanch Defendants did not raise a ripeness defense on the Purported Loans prior to their post-trial answering brief.

[286] *Id.* 32.

[287] JX 401; JX 402; JX 403.

[288] JX 401; JX 402; JX 403.

[289] Tr. 492:6–12 (Skinner).

were made because they are dated December 31, 2015 and December 31, 2016.[290] The loan amounts in the Promissory Notes do not match the amounts paid to Skinner Capital and Red Bridge after November 2015. Also, for similar reasons as described above with respect to the Management Fees, the Blanch Defendants' argument that Diamond acquiesced to the Purported Loans through his November 2016 email to Eisenberg fails: Diamond could not have acquiesced to loans that were not, in fact, loans.[291] Indeed, as of November 2015, the Promissory Notes did not even exist and therefore Diamond could not have acquiesced to them.[292]

Even if the Promissory Notes were not sham documents, there is no evidence that Blanch or Skinner disclosed the Promissory Notes to Plaintiff as required by the LLC Agreement. Diamond testified that he first saw the Promissory Notes during this litigation.[293] There is also no evidence that the terms of the Promissory Notes were determined to be fair and reasonable pursuant to the requirements of the LLC Agreement. Defendants did not present any experts. Skinner testified that he believed that the Promissory Notes to Skinner Capital were commercially

---

[290] JX 401; JX 402; JX 403.

[291] *See* JX 317.

[292] To the extent that Defendants imply that any difference between the Promissory Notes and the payments to Skinner Capital and Red Bridge resulted from a purported advance of management fees, the November 2016 email between Diamond and Eisenberg makes no mention of advances of management fees or guaranteed payments, and Diamond therefore could not have consented to any such advance. *Id.*

[293] Tr. 141:3–10 (Diamond).

reasonable.[294]  This testimony is not credible because the terms of the Promissory Notes are facially not commercially reasonable.  They are 2% notes with a 15-year maturity date, for hundreds of thousands of dollars, and there are no factual circumstances warranting their issuance.  The Purported Loans were breaches of Section 5.2 of the LLC Agreement.

### iii.    Defendants' General Acquiescence and Unclean Hands Defenses

Skinner argues that he did not commit any breach of the LLC Agreement because all of his actions in controlling Clovis's finances were purportedly done at the "direction" of Diamond.[295]  At trial, Skinner testified that Diamond "knew what payments were going on" and had "access to the checking [account]."[296]  In his post-trial brief, Skinner contended that Diamond and Carter treated all of Diamond's entities as a single entity, that Diamond was able to monitor Clovis's tax returns through Eisenberg, that Skinner and Diamond spoke regularly, and that Diamond "had complete control of Brian Skinner."[297]  Skinner's arguments are not supported by any specific evidence and they are no defense to Plaintiff's claim for breach of the LLC Agreement.  The evidence does not support Skinner's claim that Diamond

---

[294] Tr. 484:1–8 (Skinner).

[295] Skinner's Post-Tr. Br. 24.

[296] Tr. 340:4–20 (Skinner).

[297] Skinner's Post-Tr. Br. 24.

directly controlled his actions. The connections between Diamond Carter Trading, Clovis, and Maison do not support Skinner's claim that they were all treated as a singular entity.[298] Apart from the Management Fees, as discussed above, Skinner has cited no documentary evidence establishing that Diamond knew of any of the other payments from Clovis to Skinner Capital or for Skinner's personal expenses before the payments occurred or that Diamond subsequently ratified them.

Most fundamental, the documentary evidence indicates that, rather than act under Diamond's control, Skinner sought to control and conceal financial information regarding Clovis from Diamond. In 2015, Diamond asked Skinner to "go over" some questions from Eisenberg relating to Clovis's tax treatment of payments to Richard and Skinner.[299] In response, Skinner wrote "[Eisenberg] should direct questions about Clovis to me. Makes no sense to relay the answers. Everything below is wrong."[300] Skinner provided Schedule K-1s to Plaintiff that did

---

[298] Skinner cites joint trial exhibits 598 and 627 in support of his argument that Clovis "was an extension of Diamond Carter Trading, LLC." Skinner's Post-Tr. Br. 24. JX 598 is a life insurance policy for Skinner. JX 627 is an email chain between Skinner and an attorney, Christopher Ezold, regarding a telephonic conversation about ViaStone with Diamond and Skinner's direction to Ezold to create a limited liability company for the purchase of ViaStone. The email chain is dated in the summer of 2013, before Clovis was created. Neither document demonstrates that Clovis "was an extension of Diamond Carter Trading, LLC," as Skinner claims. Nor does Skinner provide legal support to treat the entities as one.

[299] JX 233.

[300] *Id.*

67

not accurately reflect the Company's actual assets and cash.[301]  In 2018, Skinner directed Citrin Cooperman to send Diamond only Stone & Paper's K-1, rather than "the whole Clovis Tax Return."[302]  Skinner even tacitly acknowledged in testimony that his characterizations of treatment of payments from Clovis were inconsistent and could raise potential tax liability issues.[303]  At bottom, Skinner's argument that he acted in deference to Diamond is ultimately not credible because his actions—including making payments to himself and Blanch from Clovis's funds and attempting to recharacterize the payments back and forth between salaries and loans—are consistent with a course of conduct intended to profit himself at Stone & Paper's, and indirectly Diamond's, expense.

The Blanch Defendants argue that any recovery by Plaintiff as to the Management Fees should be barred by the doctrine of unclean hands.  "The doctrine of unclean hands is based on the long-established rule that if a party who seeks relief in a Court of Equity 'has violated conscience or good faith or other equitable principles in his conduct, then the doors of the Court of Equity should be shut against

---

[301] *Compare* JX 524 at P00211 (showing that Plaintiff's capital account for Clovis held approximately $1.7 million in assets at the end of 2016) *and* JX 523 at P0038 (showing that Plaintiff's capital account for Clovis held approximately $1.4 million in assets at the end of 2017) *with* JX 503 at CITIBANK_001773, CITIBANK__001797 (showing that Clovis only had approximately $194,000 in its only bank account at the end of 2016 and $17,000 in its only bank account at the end of 2017).

[302] JX 411.

[303] Tr. 491:5–492:5 (Skinner).

him.'" *Universal Enter. Gp., LP v. Duncan Petroleum Corp.*, 2014 WL 1760023, at *7 (Del. Ch. Apr. 29, 2014) (quoting *Bodley v. Jones*, 50 A.2d 463, 469 (Del. 1947)), *aff'd*, 99 A.3d 228 (Del. 2014) (ORDER). "[C]ourts of equity have extraordinarily broad discretion in application of the [unclean hands] doctrine." *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998); *SmithKline Beecham Pharm. Co. v. Merck & Co., Inc.*, 766 A.2d 442, 448 (Del. 2000) ("The Court of Chancery has broad discretion in determining whether to apply the doctrine of unclean hands."). For the doctrine of unclean hands to apply, Plaintiff's inequitable conduct must generally have an "immediate and necessary" relationship to its claims. *Nakahara*, 718 A.2d at 523. In applying the doctrine, the court must "'examine the particular transactions and circumstances involved . . . which are alleged to taint [the subject of the suit.'" *Id.* at 523–24 (quoting *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 388 (1944)).

The Blanch Defendants argue that Plaintiff's recovery should be barred by the doctrine of unclean hands defense based on the purported salary of $100,000 paid to John Diamond and payments from Clovis to the AMEX Account that allegedly benefited Diamond and Carter. Neither argument is persuasive. Diamond testified that Skinner wanted to pay him the $100,000 salary in exchange for computer programming services, and this testimony was credible. Diamond did not demand the salary. There was no reason why he would have done so: the $100,000 repaid

69

to Plaintiff was money that Diamond had invested in Clovis just days earlier, and Diamond did not behave inequitably by accepting Skinner's representation that Clovis would need his computer programming services.[304] I find more credible Plaintiff's theory that Skinner offered monthly payments to Diamond to later justify any objections to the monthly payments to Skinner Capital and Red Bridge. With respect to the AMEX Account, Skinner was responsible for all of the charges allocated to Clovis on the AMEX Account,[305] and Defendants have not established that any of Skinner's allocations resulted from inequitable conduct by Plaintiff.

The Defendants bear the burden of persuasion to establish unclean hands by a preponderance of the evidence. I am not persuaded that the conduct of Plaintiff or its principals warrants denial of relief. Plaintiff received $100,000 in unauthorized payments from Clovis. I find that Skinner proposed those payments, which equated

---

[304] Tr. 48:6–49:11 (Diamond) ("I said to him, you know, we just put in 3 1/2 million. You don't have to give any money back. I don't understand. If you have computer programming to do, I'll do it for free. I don't care.").

[305] Tr. 444:16–449:17 (Skinner). Skinner testified that he discussed allocating AMEX Account charges between Diamond Carter Trading and Clovis with Diamond and that Diamond would "ultimately approve the Diamond Carter Trading tax return." Tr. 458:4–11 (Skinner); Tr. 441:3–442:13 (Skinner). Skinner's testimony does not prove that Diamond knew that Skinner was misallocating funds between the entities, and Skinner's own description of the process suggests that Skinner was primarily responsible for the allocation. *See* Tr. 446:21–23 (Skinner) (testifying that he would allocate charges between the entities "quickly, talk to John, tell him what we're going to do, and give it to the accountants"); Tr. 442:6–8 (Skinner) ("Did John and I sit down and go through with a fine-tooth comb every charge? No. Most of the time we just looked at the year-end summary.")*; see also* Tr. 459:20–460:8 (Skinner) (testifying that "there was no rhyme or reason" as to how charges were allocated between entities).

to a fraction of Plaintiff's $3.5 million investment in the Company, which Skinner and Blanch control as its managers. Skinner was also the manager responsible for allocating expenses charged to the AMEX account. There is no evidence that Plaintiff or Diamond transferred any funds from Clovis or attempted to conceal the payments that Skinner made to Plaintiff. "This court has consistently refused to apply the doctrine of unclean hands to bar an otherwise valid claim of relief where the doctrine would work an inequitable result." *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 81 (Del. Ch. 2008) (quoting *Dittrick v. Chalfant*, 948 A.2d 400, 408 n.18 (Del. Ch. 2007)). Applying the doctrine in these circumstances would also work an inequitable result, allowing the Defendants to keep their ill-gotten gains through breaches of loyalty and deception, to the detriment of Plaintiff and the Company.

As the court held at the motion to dismiss stage, Plaintiff's claim for breach of contract pursuant to Section 5.2 states a direct claim against Blanch and Skinner because it is a "personal right belonging to the members" of Clovis. 2019 Memorandum Opinion, 2019 WL 2374005, at *4. Accordingly, Stone & Paper is entitled to recover directly from Blanch and Skinner with respect to the claim for breach of Section 5.2 of the LLC Agreement.

### c. Sections 4.10 and 10.7

Section 4.10 requires Clovis to provide the Members with annual financial disclosures in the form of a statement of cash flows, a report setting forth the

Members' closing capital accounts, and a copy of each Member's Schedule K-1.[306] Section 10.7 requires Clovis to "maintain records and accounts of all operations and expenditures of the Company."[307]

Skinner did not maintain any financial records for Clovis, including cash flow statements, general ledgers, or profit and loss statements.[308] The only financial records available for Clovis are its bank account statement from Citibank and its tax records. The Blanch Defendants argue that Eisenberg kept Clovis's books and records.[309] This argument is unsupported by any citation to the factual record or legal authority, and it does not absolve Skinner and Blanch from their contractual obligation to maintain books and records or provide them to members consistent with the terms of the LLC Agreement. Skinner's and Blanch's failure to maintain any financial records for Clovis constituted a breach of Sections 4.10 and 10.7 of the LLC Agreement.

### 2. Breach of Fiduciary Duties

Plaintiff claims that Blanch and Skinner, as managers of Clovis, breached their fiduciary duties of loyalty and care "by improperly diverting the bulk of the

---

[306] LLC Agreement § 4.10.

[307] *Id.* § 10.7.

[308] Tr. 404:18–406:12 (Skinner).

[309] Blanch Defs.' Ans. Br. 39.

Company's capital to their member-affiliates."[310]  Clovis is a Delaware limited liability company.  Under Delaware law, "LLC agreements import corporate fiduciary duties by default, unless the pertinent agreement provides to the contrary." *Marubeni Spar One, LLC v. Williams Field Servs. - Gulf Coast Co., L.P.*, 2020 WL 64761, at \*10 (Del. Ch. Jan. 7, 2020); *see also Beach to Bay Real Estate Ctr. LLC v. Beach to Bay Realtors Inc.*, 2017 WL 2928033, at \*5 (Del. Ch. July 10, 2017) ("Delaware LLCs are known for their contractual flexibility; however, our Courts have interpreted the Delaware LLC Act to imply default fiduciary duties to *managers* of a LLC unless such duties are clearly disclaimed.") (emphasis in original).  Section 18-1101(e) of the Delaware Limited Liability Company Act (the "Act") provides that "a limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company" except with respect to "bad faith violation[s] of the implied contractual covenant of good faith and fair dealing."[311]

Section 4.3 of the LLC Agreement, titled "Fiduciary Duties of the Managers," provides, in its entirety, that "A Manager shall perform his duties hereunder in good

---

[310] Pl.'s Post-Trial Opening Br. 29.

[311] 6 *Del. C.* § 18-1101(e).

73

faith and in a manner consistent with the requirements of the Act."[312]  The LLC

Agreement does, however, contain a limitation on personal liability.  Section 7.1(a)

provides that the managers "shall not have personal liability to the Company or its

Members for any breach of duty in such capacity, provided that nothing in this

Section 7.1(a) shall eliminate or limit the liability of any such Manager or Officer if

a judgment . . . establishes that his or her acts or omissions were in bad faith or

involved intentional misconduct or a knowing violation of law or that he or she

personally gained in fact a financial benefit to which he or she is not entitled."[313]

The LLC Agreement does not expressly disclaim fiduciary duties, and Defendants

do not argue otherwise.

This court recently elaborated on the fiduciary duties of a manager of a

Delaware limited liability company:

> In the limited liability context, as in the corporate context, the duty of
> loyalty mandates that the best interest of the company and its
> stakeholders take precedence over any interest possessed by the
> manager and not shared by the stakeholders generally.  A manager is
> not permitted to use their position of trust and confidence to further
> their private interests. Nor can fiduciaries intentionally act with a
> purpose other than that of advancing the best interests of the
> corporation.  Specifically, and very pertinently to this case, such
> fiduciary duties include the duty not to cause the corporation to effect
> a transaction that would benefit the fiduciary at the expense of the
> minority stockholders.

---

[312] LLC Agreement § 4.3.

[313] *Id.* § 7.1(a).

*Largo Legacy Grp., LLC v. Charles*, 2021 WL 2692426, at *13 (Del. Ch. June 30, 2021) (internal quotations omitted). In addition, "[a] failure to act in good faith may be shown . . . where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

Blanch and Skinner breached their fiduciary duties of loyalty to the Company. Blanch and Skinner acted in bad faith by approving the Management Fees and the Purported Loans as payments to Red Bridge and Skinner Capital. Those transactions were designed to enrich Blanch and Skinner at Clovis's expense and were not intended to "advance[e] the best interests" of Clovis. As described above, these payments were not authorized in the manner required by the LLC Agreement, did not advance Clovis's interests, and were often made to support Blanch's and Skinner's personal expenses. The record reflects that Blanch and Skinner were conscious of their wrongdoing because each engaged in acts of subterfuge designed to conceal their conduct. Blanch, with Vivianna's assistance, attempted to create a misleading paper trail regarding Red Bridge and the source of its funds, and attempted to shelter payments from Clovis to Red Bridge through Vivianna Blanch.[314] After abandoning an acquisition of ViaStone, Skinner accelerated

---

[314] JX 74; JX 77; JX 81; *see also* Tr. 881:5–18 (V. Blanch). Vivianna testified that she assumed that the misrepresentations regarding Red Bridge were intended to assist in sheltering assets from claimants in the Metier Action. This assumption does not affect my

75

payments from Clovis to Skinner Capital, attempted to disguise them as loans through the sham Promissory Notes, and then later attempted to recharacterize them as guaranteed payments to Clovis's accountants. These acts demonstrate that Blanch's and Skinner's breaches were intentional. Further, for the reasons described above, Blanch and Skinner breached their fiduciary duty of loyalty. Thus, apart from Diamond's acquiescence to Skinner paying Skinner Capital $400,000 in Management Fees, the Management Fees and the Purported Loans constitute breaches of Blanch's and Skinner's fiduciary duties of loyalty.[315]

Plaintiff has also established that Skinner breached his fiduciary duties with respect to the payments to the AMEX Account.[316] From 2014 to 2017, Skinner allocated over $535,000 of AMEX Account charges to Clovis. During that same time period, Skinner paid approximately $510,000 to the AMEX Account from

---

determination. Blanch's actions are consistent with a motive to shelter unauthorized payments from Clovis from any scrutiny, not just from claimants in the Metier Action.

[315] Because Plaintiff's breach of fiduciary duty claim and breach of contract claim may affect the measure of damages, it is necessary to adjudicate both claims. *Backer v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 109 (Del. 2021) ("The bootstrapping case law only requires dismissal where a fiduciary duty claim wholly overlaps with a concurrent breach of contract claim," and recognizing that this court may decline to treat such claims as duplicative where different remedies may result). *See also* 2019 Memorandum Opinion, 2019 WL 2374005, at *6 n.57 (Del. Ch. May 31, 2019) (holding, at the motion to dismiss stage, that the breach of fiduciary duty and breach of contract claims could proceed because they were grounded in distinct factual allegations).

[316] Plaintiff generally argues that both Skinner and Blanch breached their fiduciary duties with respect to the AMEX Account payments, but Plaintiff has not established that Blanch is or should be responsible for those payments, which were processed only by Skinner.

76

Clovis's funds. Plaintiff has established that many, if not most, of the charges that Skinner allocated to Clovis (and then paid for with Clovis's funds) were in Skinner's self-interest rather than in Clovis's interest. For example, in 2014, over $100,000 of the $175,104 that Skinner allocated to Clovis were for strip clubs that Skinner frequented alone.[317] Although some of the charges that Skinner allocated to Clovis may have had legitimate Clovis-related purposes, Skinner did not allocate the charges between Diamond Carter Trading and Clovis on any principled basis. Skinner testified that there was "no rhyme or reason exactly how they got allocated."[318] Skinner's inability to properly account for the charges on the AMEX Account with any specificity cannot be not a defense to Plaintiff's allegation that Skinner used Clovis's funds to pay the AMEX Account in bad faith. By continually allocating his personal expenses to Clovis and then using Clovis's funds to pay for those expenses, Skinner acted in bad faith as a manager of Clovis with respect to payments to the AMEX Account.

The LLC Agreement's limitation on liability provides that "[t]he Managers and Officers shall not have personal liability to the Company or its Members for any breach of duty in such capacity, provided that nothing in this Section 7.1(a) shall

---

[317] JX 649; Tr. 452:13–16 (Skinner).

[318] Tr. 459:24–8 (Skinner) ("Sometimes it was accurate and sometimes it was just, hey, put some on this entity, put some on that entity.").

eliminate or limit the liability of any such Manager or Officer if a judgment . . . establishes that his or her acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law or that he or she personally gained in fact a financial benefit to which he or she is not entitled."[319]  In this case, the limitation of liability does not apply because Blanch and Skinner's conduct was intentional and because they each, through their respective LLCs, gained a financial benefit to which they were not entitled.  Blanch and Skinner are personally liable for their breaches of fiduciary duty.

### 3. Fraud

Plaintiff claims that Blanch, Skinner, Red Bridge, and Skinner Capital committed fraud in two respects.  First, Plaintiff argues that the defendants fraudulently induced Plaintiff to invest $3.5 million into Clovis.  Second, Plaintiff argues that the defendants fraudulently concealed their draining of Clovis's funds. Under Delaware law, a plaintiff must prove fraud by a preponderance of the evidence.  *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 54 (Del. Ch. 2001).[320]

---

[319] LLC Agreement § 7.1(a).

[320] Some parties have argued that the standard for fraud in Delaware is clear and convincing evidence.  *Cf. Ross Hldg. & Mgmt. Co. v. Advance Realty Grp., LLC*, 2014 WL 4374261, at *37 (Del. Ch. Sept. 4, 2014) (applying clear and convincing evidence standard to a fraud in the inducement claim).  *Ross* did not state the burden for a common law fraud claim under Delaware law.  Instead, the case involved a fraud claim under New Jersey law.  *See id*. at *37 & n.283 (citing *Liberty Mut. Ins. Co. v. Land*, 892 A.2d 1240, 1247 (N.J. 2006), for the applicable standard).  In an earlier opinion in that case, the court observed:  "The parties agree that New Jersey law governs the substantive issues in this case."  *Ross Hldg.*

### a.    Fraudulent Inducement

"The elements of fraudulent inducement are the same as those of common law

fraud." *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at \*12 (Del.

Ch. Sept. 10, 2018) (internal citations omitted).  The elements of fraud are:

> (1) a false representation, usually one of fact, made by the defendant;
> (2) the defendant's knowledge or belief that the representation was
> false, or was made with reckless indifference to the truth; (3) an intent
> to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's
> action or inaction taken in justifiable reliance upon the representation;
> and (5) damage to the plaintiff as a result of such reliance.

*Id.* (quoting *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d

457, 461-62 (Del. 1999)).   Fraud can be committed through "(1) an overt

misrepresentation; (2) silence in the face of a duty to speak; or (3) active

concealment of material facts." *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 804 (Del.

Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v.

PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).    A party that owes

common law fiduciary duties owes a duty to speak.  *Bay Ctr. Apartments Owner,

LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at \*11 (Del. Ch. Apr. 20, 2009).

---

*& Mgmt. Co. v. Advance Realty Grp., LLC*, 2010 WL 1838608, at \*5 n.10 (Del. Ch. Apr. 28, 2010).  In addition, the post-trial briefs addressed the fraud claim under New Jersey law.  *See Ross Hldg. & Mgmt. Co. v. Advance Realty Grp.*, LLC, C.A. No. 4113-VCN (Dkt. 278), Defendant's Post-Trial Brief at 78 ("A cause of action in legal fraud in New Jersey requires the proof of five elements *by clear and convincing evidence . . . .*" (emphasis in original)); *id.* (Dkt. 248), Plaintiffs' Trial Brief at 39 (citing New Jersey case law for the elements of fraud).  The parties here have briefed the fraud claims under Delaware law and none of them have argued that any other state's law applies.

79

As discussed above, the LLC Agreement does not eliminate Blanch's and Skinner's fiduciary duties.

Plaintiff claims that Blanch, Skinner, Red Bridge, and Skinner Capital "fraudulently induced Plaintiff to invest in Clovis."[321] In support of their fraud theory, Plaintiff argues that Skinner and Blanch "knowingly and falsely represented that: (1) Clovis was a legitimate business being formed to purchase ViaStone; (2) Plaintiff's capital investment would be used solely to fund the purchase and operations of ViaStone; (3) the purchase of ViaStone was imminent; and (4) Drew Aaron would be involved in providing order flow for the post-acquisition ViaStone."[322] Plaintiff therefore seeks all of its $3.4 million invested—$3.5 million minus the $100,000 previously paid to Plaintiff—as a damages award from Skinner and Blanch.

Plaintiff's fraud claim proceeds from the premise that Clovis was a sham entity *ab initio*. Plaintiff cites an email between Skinner and Blanch prior to the formation of Clovis in which Blanch urges Skinner to persuade Diamond and Carter to set aside funds under Skinner's control for Skinner to invest on their behalf.[323] This email does not establish that Clovis was an illegitimate business or not intended

---

[321] Pl.'s Post-Tr. Opening Br. 35.

[322] *Id.*

[323] JX 4.

to acquire ViaStone. Blanch's email proposes a course of action to enable Skinner to leverage Diamond's and Carter's money to enrich himself through salary and equity through various deals (including a deal with Metier).[324] Blanch speculates that Skinner will be able to obtain significant returns from Diamond's and Carter's investments and that this will be "lucrative, long term, for all parties," including Diamond and Carter.[325] In a similar vein, Plaintiff cites an email between Skinner and Blanch prior to the formation of Clovis in which Blanch and Skinner discuss the possibility of working directly with TLM rather than acquiring ViaStone.[326] The email indicates that Skinner and Blanch consider this a secondary plan—a Plan B—to the acquisition of ViaStone. Though Blanch states "we might need to go straight to China and buy direct," he also sets out "next steps" for the acquisition of ViaStone and demeans the ViaStone managers for purportedly failing to understand the benefits that Clovis purchasing ViaStone will provide to them.[327]

I am not persuaded that Blanch and Skinner never intended for Clovis to acquire ViaStone. For more than a year after forming Clovis, Blanch and Skinner

---

[324] JX 4 (advising Skinner to "secure your $180,000 base salary," to "participate in the upside of D+C deals," and to "utilize D+C capital to slowly diversify the business into other categories of finance").

[325] *Id.* ("Meantime, you are building a track record for D+C, for Brian Skinner and doing it at a rather low commitment. Much more lucrative, long term, for all parties, then having $10MM in an underfunded hedge fund.").

[326] JX 29.

[327] *Id.*

performed work on behalf of Clovis to generate interest for ViaStone's stone paper products, including by meeting with Chow and potential stone paper customers.[328] Blanch and Skinner directed their attorney, Okulski, to take an aggressive position with Chow during negotiations to purchase ViaStone.[329] But this course of conduct—however mendacious—contradicts Plaintiff's theory that Clovis was a sham designed to defraud it into handing over $3.5 million to Defendants. At least initially, Blanch and Skinner acted to maximize leverage for the possible acquisition of ViaStone and to lay the groundwork for the possibility of lucrative customer relationships after the acquisition. The fact that their initial strategy did not succeed does not mean that Blanch's and Skinner's intent at Clovis's formation was to defraud Plaintiff.

Plaintiff contends that it was told that the purchase of ViaStone was "imminent," that Aaron was going to supply ViaStone with paper orders, and that its investment would only be used "to fund the purchase and operations of

---

[328] Tr. 626:9–627:13 (R. Blanch) (testifying that Clovis spent "four years doing nonstop testing, due diligence, paper trials, [and] client meetings."). Though Plaintiff faults Defendants for failing to secure any agreements or benefits to Clovis through this work, Pl.'s Opening Br. 32, Plaintiff does not contest that these meetings and this work actually occurred. The evidence indicates Blanch and Skinner performed work regarding the subjects listed by Blanch in his testimony at least nominally on behalf of Clovis for some period after its formation. *See* PX 1; PX 4, PX 6; PX 7; JX 201; *see* ViaStone Rule 30(b)(6) Dep. 63:6–7 ("Brian was at most all of the meetings more than Richard.").

[329] JX 191.

ViaStone."[330]  Plaintiff has failed to establish fraudulent inducement based on these representations.  Plaintiff cites Diamond's testimony that he was repeatedly told that everything was "going well" with the stone paper business and that in August 2014, he was told that an acquisition of ViaStone was imminent.[331]  These statements post-date Clovis's formation and Plaintiff has not proven by a preponderance of the evidence that these statements were knowingly false or made with a reckless indifference to the truth at the time that they were made.

Plaintiff's evidence regarding representations by Blanch to Diamond regarding Aaron's involvement in Clovis do not prove that Clovis was intended to defraud Plaintiff from the outset.  Plaintiff cites a February 2014 email from Blanch to Diamond and others pressuring them to invest sooner to take advantage of a prospective 20,000 ton order from Aaron.[332]  The contemporaneous evidence, however, indicates that Blanch believed that Aaron was going to make an order from ViaStone.  In December 2013, Blanch advised his attorney that Aaron would not be investing in the acquisition entity for ViaStone, but that he would be providing a "$23MM opening order for paper" "through Tier 1/ViaStone."[333]  Blanch stated that Aaron's anticipated 20,000 ton "order automatically makes our company legitimate

---

[330] Pl.'s Post-Tr. Opening Br. 35.

[331] Tr. 59:12–21 (Diamond); Tr. 118:13–119:1 (Diamond).

[332] JX 44.

[333] JX 35.

and makes us all money."[334]  Diamond met with Blanch, Skinner, and Aaron in October 2013, which convinced Diamond to invest in ViaStone.[335]  In January 2014, Blanch and Aaron were actively discussing the possibility of Aaron making a 20,000 ton order from ViaStone.[336]  Aaron did not testify in this action.  There is no evidence from which the Court can determine that Blanch's statement was knowingly false or made with a reckless indifference to the truth.  Plaintiff's arguments that Blanch and Skinner falsely represented that its investment would only be used "to fund the purchase and operations of ViaStone" fail because the contract does not expressly require Blanch and Skinner to exclusively use Clovis's investment to first purchase and then operate ViaStone.[337]  It is also contradicted by Diamond's agreement to allow Skinner to take a $20,000 monthly fee starting in April 2014 and Diamond's acceptance of $10,000 in monthly payments to Plaintiff.  Plaintiff therefore has not proven that Blanch and Skinner fraudulently induced Plaintiff to invest in Clovis.

### b.    Fraudulent Concealment

To establish a claim for fraudulent concealment, Plaintiff must prove the following elements:  "(1) [d]eliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) [t]hat the defendant

---

[334] JX 44.

[335] Tr. 19:13–20:6 (Diamond).

[336] JX 592.

[337] LLC Agreement §§ 1.1(kk), 5.2.

acted with scienter; (3) [a]n intent to induce plaintiff's reliance upon the concealment; (4) [c]ausation; and (5) [d]amages resulting from the concealment." *DG BF, LLC v. Ray*, 2021 WL 776742, at \*20 (Del. Ch. Mar. 1, 2021) (quoting *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987)).

The record is replete with evidence that Skinner and Blanch purposefully aimed to conceal their self-dealing from Plaintiff. Blanch's and Skinner's communications with Clovis's accountants, characterizing payments from Clovis to Skinner Capital and Red Bridge as loans, worked a fraud on the Plaintiff because they were not loans.[338] Skinner's instructions in 2018 to Citrin Cooperman to recharacterize certain loans as guaranteed payments was a further intentional act to conceal the nature of the payments, as were the Promissory Notes themselves.[339] In addition, the Schedule K-1s that Skinner provided to Plaintiff indicated that Plaintiff's capital account was worth $1.7 million at the end of 2016 and $1.4 million at the end of 2017,[340] while Clovis held only $193,000 in its bank account at the end of 2016 and $16,000 in its bank account at the end of 2017.[341] Skinner and Blanch

---

[338] *See* Tr. 1065:14–21 (Eisenberg) (testifying that Richard and Skinner instructed him to treat $240,000 disbursements as loans); JX 233 (Skinner informing Diamond that only he should communicate with Eisenberg).

[339] JX 406.

[340] JX 524 at P00211; JX 523 at P0038.

[341] JX 503 at CITIBANK_1773.

sought to keep Diamond uninformed about Clovis's financial status,[342] and they were frustrated when their accountants notified Diamond about the recharacterization of the loans.[343]

These acts constituted "overt misrepresentation[s]" and "active concealment of material facts," and I find that they were knowingly false. *Am. Int'l Grp., Inc.*, 965 A.2d at 804. Skinner and Blanch engaged in a broad scheme intended to induce Plaintiff into inaction regarding their misappropriation of funds from Clovis, Plaintiff was induced into inaction, and Plaintiff's interests were damaged as a result. *Id.* For the foregoing reasons, Blanch and Skinner are liable for fraudulent concealment. Their fraudulent concealment, however, does not support a damages award beyond the damages awardable from Skinner's and Blanch's breaches of contract and fiduciary duty. In its briefing, Plaintiff argues that Blanch and Skinner intended to prevent Plaintiff from requesting an early return of its capital. But the LLC Agreement prevented Plaintiff from obtaining a return of capital without the managers' approval, so Plaintiff was not harmed in that manner. Plaintiff's damages resulting from Blanch's and Skinner's fraudulent concealment are already subject to

---

[342] In an email, Skinner instructed Citrin Cooperman to send Diamond "only the Stone and Paper Investors K-1," stating that "he does not need the whole Clovis Tax Return." JX 411. Skinner carefully added, "[i]f this is not possible please let me know." *Id.*

[343] When a Citrin Cooperman accountant copied Diamond on her response to Skinner's request to convert part of the loan to a guaranteed payment, Skinner sent a separate email to Blanch: "FYI, Spencer had her add John Diamond. I will take that up with Spencer." JX 414.

recovery by Plaintiff through its breach of contract and breach of fiduciary duty claims.

### 4. Civil Conspiracy and Aiding and Abetting

Plaintiff also asserts claims that Defendants engaged in civil conspiracy and that Vivianna Blanch, Red Bridge, and Skinner Capital aided and abetted the breaches of fiduciary duty and contract by Blanch and Skinner. "[C]ivil conspiracy and aiding and abetting are quite similar." *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *22 (Del. Ch. Nov. 26, 2014). "The two theories differ in their emphasis: '[A]iding and abetting is a cause of action that focuses on the wrongful act of providing assistance, unlike civil conspiracy that focuses on the agreement.'" *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 282 (Del. Ch. 2021) (quoting *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt. L.P.*, 2011 WL 5314507, at *17 (Del. Super. Nov. 2, 2011), *aff'd*, 49 A.3d 1168 (Del. 2012)). "This court largely has equated claims for aiding and abetting and civil conspiracy, noting that the two theories often cover the same ground and that the distinctions usually are not material." *Id.*

The elements for civil conspiracy are "(i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties." *Agspring Holdco,*

*LLC v. NGP X US Hldgs., L.P.*, 2020 WL 4355555, at \*21 (Del. Ch. July 30, 2020) (internal citations omitted). A plaintiff need not "prove the existence of an explicit agreement; a conspiracy can be inferred from the pled behavior of the alleged conspirators." *Am. Int'l Group*, 965 A.2d at 806.

Plaintiff has proven by a preponderance of the evidence that Defendants engaged in a civil conspiracy to misappropriate Clovis's funds. For the reasons described above, I find that all of the Defendants formed part of the conspiracy to misappropriate Clovis's funds because Blanch, Vivianna Blanch, and Skinner acted in concert to misappropriate funds from Clovis. Blanch and Skinner paid themselves Management Fees in breach of the LLC Agreement. They directed the payment of those fees to Skinner Capital and Red Bridge. After definitively deciding not to acquire ViaStone, Blanch and Skinner turned to looting Clovis. They accelerated payments to Red Bridge and Skinner Capital for their personal use and acted jointly to instruct Eisenberg to recharacterize the $240,000 disbursements to Red Bridge and Skinner Capital as loans rather than guaranteed payments.[344] Skinner interceded with Diamond to avoid scrutiny of payments to Red Bridge.[345] Blanch and Skinner each relied on the sham Promissory Notes to disguise their self-dealing. Blanch and

---

[344] Tr. 1065:14–24 (Eisenberg).

[345] Tr. 124:9–125:25 (Diamond).

Skinner regularly communicated with each other, both before and after they formed Clovis, and they excluded Diamond from most of their communications.[346]

Vivianna Blanch participated in the conspiracy. She is Red Bridge's sole member. She established a bank account for the purpose of receiving Blanch's Management Fees, under false pretenses. She then used the money flowing into Red Bridge to pay for personal expenses.[347] Vivianna Blanch testified that she knew that Red Bridge was being formed to shield payments from recovery.[348]

---

[346] *See*, *e.g.*, JX 414 (February 23, 2018 email from Blanch to Skinner, informing Skinner that, to their chagrin, Clovis's accountants had copied Diamond on an email chain about Clovis forgiving loans made to Skinner Capital).

[347] Tr. 930:7–9 (V. Blanch). There is no credible evidence adduced at trial that any person other than Vivianna Blanch was ever a member of Red Bridge, and Vivianna Blanch was repeatedly held out as Red Bridge's sole member. *See, e.g.*, JX 42 (Blanch stating that Red Bridge "is my wife's company"); JX 78 (agreement to open an account at First Republic Bank listing Vivianna as the sole signer); JX 353 (June 3, 2017 email from Blanch to Diamond, Carter, and Skinner, stating that Red Bridge is "an LLC owned by Vivianna Blanch"). During discovery, the Blanch Defendants produced an operating agreement of Red Bridge dated April 18, 2014 purporting to reduce Vivianna's ownership of Red Bridge to 1%. The operating agreement is not a credible document. The document was produced with no metadata, it is inconsistent with other documents, and Vivianna testified at her deposition that she did not know when she signed the document. V. Blanch Dep. 102:16–103:2. Vivianna's testimony regarding this issue at trial was disjointed and unreliable. Tr. 916:19–22 (V. Blanch) ("Q. And when did you sign this document? A. In April. Q. Of this year? A. I think it was dated 2014."). It was a conscious attempt to avoid damaging testimony regarding the provenance of the document. In their opening post-trial brief, Plaintiff argued that the operating agreement was a sham document. Pl.'s Opening Post-Tr. Br. 51–53. The Blanch Defendants did not respond to this argument or make any argument regarding Red Bridge's purported operating agreement, and any such argument is waived.

[348] Tr. 881:5–18 (V. Blanch) ("I made the assumption that it was to help mitigate any risk from the previous lawsuit . . . . So I didn't ask too many questions. I just said, sure. Just let me know what I need to do.").

Blanch and Skinner misappropriated funds from Clovis in breach of their fiduciary duty of loyalty and, in so doing, committed fraud. They did so with the aid of Vivianna Blanch, Red Bridge, and Skinner Capital. These unlawful acts caused damage to Clovis, and so each of the elements of civil conspiracy has been proven by a preponderance of the evidence.

Plaintiff further claims that Defendants Vivianna Blanch, Red Bridge, and Skinner Capital aided and abetted Blanch's and Skinner's breaches of fiduciary duty. To prove aiding and abetting a breach of fiduciary duty, a plaintiff must prove "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach." *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015). Claims for aiding and abetting breaches of fiduciary duty and civil conspiracy "often rise and fall together." *In re Pattern Energy Group Inc. S'holders Litig.*, 2021 WL 1812674, at *76 (Del. Ch. May 6, 2021).

For the reasons described above, Blanch and Skinner breached their fiduciary duties owed to Clovis. Vivianna Blanch, Red Bridge, and Skinner Capital knowingly participated in those breaches. They were mechanisms through which Blanch and Skinner obtained and funneled the misappropriated assets. Vivianna Blanch actively participated in creating a bank account for Red Bridge for receipt of the funds from Clovis, falsely representing that the funds were the product of a

90

consulting agreement she had with the Company. She provided no services to the Company. She was the sole member of Red Bridge, and her "knowing behavior . . . and her knowledge can be imputed to Red Bridge." 2019 Memorandum Opinion, 2019 WL 2374005, at 7. Similarly, Skinner's knowledge of his improper conduct can be imputed to Skinner Capital.

"[T]he receipt of improper benefits suffices to prove their participation in the alleged breaches of fiduciary duties." *Carlton Investments v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *16 (Del. Ch. Nov. 21, 1995); *see also* 2019 Memorandum Opinion, 2019 WL 2374005, at *7 (holding, at the motion to dismiss stage, that Plaintiff's Complaint stated a claim for aiding and abetting fiduciary duty liability because Vivianna Blanch and Skinner Capital accepted "large monetary payments directly from the Company for an extended period of time" without performing substantial work or conferring other benefits to Clovis). The misappropriations proximately caused damage to Clovis. Plaintiff has therefore proven its claim for aiding and abetting breaches of fiduciary duty against Vivianna Blanch, Red Bridge, and Skinner Capital.[349]

---

[349] Because I find that Vivianna Blanch, Red Bridge, and Skinner Capital are liable for civil conspiracy and aiding and abetting breaches of fiduciary duty, I need not reach Plaintiff's veil-piercing claim that Blanch, Vivianna Blanch, and Red Bridge are each separately liable for damages against the Blanch Defendants.

## B.      Nominal Defendant Clovis's Affirmative Counterclaims

The crux of Clovis's counterclaims is that Stone & Paper breached the LLC Agreement. Clovis alleges that Stone & Paper violated two provisions of the LLC Agreement. The first provision is Section 4.9, which governs reimbursement of expenses from Clovis: "The Managers will receive from the Company reimbursement for all reasonable out-of-pocket expenses incurred upon submission of receipts for such expenses; provided that the reimbursement of any expense item in excess of $5,000 shall require Board approval."[350] The managers of Clovis are Skinner and Blanch;[351] Stone & Paper is a passive investor, not a manager.[352] As the Court held in the 2020 Memorandum Opinion, Section 4.9 "only govern[s] the relationship between the between the managers and the Company and do[es] not impose any obligations on Stone & Paper." 2020 Memorandum Opinion, 2020 WL 3496694, at *7 n.29. Because Section 4.9 does not impose any obligation on Stone & Paper, Stone & Paper did not breach Section 4.9. *See Lavender v. Koenig*, 2017 WL 443696, at *6 (Del. Super. Ct. Feb. 1, 2017) ("Defendants must have owed Plaintiffs a contractual obligation in order for Plaintiffs to assert successfully a

---

[350] LLC Agreement § 4.9.

[351] *Id.* §§ 1.1(v), 4.1(a).

[352] Tr. 120:3–121:15 (Diamond).

breach of contract claim.") (citing *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003)), *aff'd,* 171 A.3d 1117 (Del. 2017).

The second provision is Section 9.6, which governs withdrawal of capital:

> A Member shall not be entitled to demand or receive from the Company the liquidation of his or its Membership Interest in the Company until the Company is dissolved . . . . Notwithstanding the foregoing . . . , [Stone & Paper] may request the return of its initial Capital Contribution, provided such amounts are available and approved by the Board consisting of at least two (2) Managers.[353]

Clovis argues that Stone & Paper received a return of its initial capital contribution without approval of both managers, in violation of Section 9.6 of the LLC Agreement, when Clovis (1) paid ten $10,000 monthly payments to Diamond in 2014 (the "2014 Payments"), (2) paid $510,124.35 to the AMEX Account, and (3) paid $21,000 for the Milton Berg newsletter.

### 1. The 2014 Payments

In early 2014, Skinner proposed paying $10,000 each month to Stone & Paper in exchange for Diamond performing computer programming services for Clovis.[354] From April 2014 to December 2014, Clovis sent to Stone & Paper a total of $100,000 over ten payments.[355] Skinner authorized and processed these payments.[356]

---

[353] LLC Agreement § 9.6.

[354] Tr. 48:6–49:11 (Diamond).

[355] JX 643 at P06297.

[356] Tr. 49:2–11 (Diamond).

Diamond received the last payment in December 2014, after Aaron learned about the payments and asked that they be stopped.[357] Diamond never performed any computer programming for Clovis.[358] Diamond considered the $100,000 to be a return of capital to Stone & Paper,[359] and he kept $70,000 for himself and transferred $30,000 to Carter, per their ownership shares in Stone & Paper.[360]

Clovis argues that the $100,000 was an improper return of capital to Stone & Paper, in violation of Section 9.6 of the LLC Agreement, which permits return of Stone & Paper's initial capital contribution only upon request with approval of the managers. Clovis also argues that Stone & Paper was unjustly enriched by the $100,000 payment.[361] The 2014 Payments form the basis for the only portion of Clovis's claim for unjust enrichment that survived Stone & Paper's motion to dismiss.[362]

---

[357] *Id.*

[358] Tr. 99:16–21 (Diamond).

[359] Tr. 108:18–109:17 (Diamond) ("The plaintiff, Stone & Paper Investors, who had invested $3.5 million, received $100,000 back of its initial capital contribution.").

[360] Tr. 96:10–97:10 (Diamond).

[361] In its post-trial briefing, Clovis generally states that Stone & Paper was unjustly enriched by all three actions, but the substance of the briefing only focused on the aspects of the unjust enrichment claim that were previously dismissed in the 2020 Memorandum Opinion. Def.'s Opening Post-Tr. Br. 13–14. Stone & Paper argues that Clovis abandoned its unjust enrichment claim as to the 2014 Payments by not substantively addressing it in post-trial briefing. Pl.'s Ans. Post-Tr. Br. 34. Because I am denying Clovis's counterclaims on other grounds, it is not necessary to determine whether Clovis has waived this argument by only making a mere mention of it in its brief.

[362] 2020 Memorandum Opinion, 2020 WL 3496694, at *13.

94

Clovis's claims with regard to the 2014 Payments are barred by laches. "[Laches] is generally defined as an unreasonable delay by the plaintiff in bringing suit after the plaintiff learned of an infringement of his rights, thereby resulting in material prejudice to the defendant." *Reid v. Spazio*, 970 A.2d 176, 182 (Del. 2009). "Under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law." *Id.* at 183 (quoting *Wright v. Scotton*, 121 A. 69, 72–73 (Del. 1923)). "Absent a tolling of the limitations period, a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims are barred by laches." *Whittington v. Dragon Grp., L.L.C.*, 991 A.2d 1, 9 (Del. 2009). For Clovis's contract claims, "the analogous statute of limitations is 10 *Del. C.* § 8106, under which a breach of contract action must be brought within three years from the date that the cause of action accrued." *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 768 (Del. 2013). Similarly, "Delaware law sets a three[-]year statute of limitations for claims for unjust enrichment." *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *15 (Del. Ch. Dec. 1, 2009).

"Typically, the statute of limitations begins to run when the cause of action accrues, not when the injury is discovered." *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008). Clovis's claims accrued when the last of the 2014 Payments was made in December 2014. The three-year statute of limitations for the breach of

95

contract and unjust enrichment claims expired in December 2017. Clovis did not assert its counterclaims until July 2019. If the plaintiff asserts its claim after the expiration of the analogous statute of limitations, the delay is presumptively unreasonable. *Levey*, 76 A.3d at 768; *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013) ("After the statute of limitations has run, defendants are entitled to repose and are exposed to prejudice as a matter of law by a suit by a late-filing plaintiff who had a fair opportunity to file within the limitations period."); *Baier v. Upper New York Inv. Co. LLC*, 2018 WL 1791996, at *12 (Del. Ch. Apr. 16, 2018) (same).

Two circumstances in which the statute of limitations will be equitably tolled are (1) when the defendant affirmatively acted to prevent the plaintiff from gaining knowledge of the facts (i.e., fraudulent concealment) or (2) when the plaintiff "reasonably relies on the competence and good faith of a fiduciary." *Weiss*, 948 A.2d at 451. The 2014 Payments do not present circumstances that would toll the statute of limitations or justify Clovis's delay in bringing its claims. Stone & Paper does not owe fiduciary duties to Clovis, and Stone & Paper has taken no action to conceal the existence of the payments from Clovis. From the very beginning, Skinner had knowledge of the 2014 Payments, as he was the one who proposed and processed the payments. Furthermore, Skinner is a signatory of the LLC

Agreement,[363] and thus had knowledge of Section 9.6's limitation on the return of capital. As a manager of Clovis with authority over Clovis's finances, Skinner's knowledge is attributed to Clovis.[364]

The Blanch Defendants contend that Clovis's claim challenging the payment of $100,000 to Stone & Paper is not barred by laches because Blanch was unaware of it until 2018. Blanch's testimony regarding this issue was not credible, and the circumstances of the payments to Stone & Paper further discredits his testimony.[365] It is undisputed that Skinner, the other Manager, was aware of the payments. Skinner made them, and there is no evidence that he tried to conceal those payments from

---

[363] JX 36 at 28.

[364] *See* LLC Agreement § 4.1(b)–(d) (providing that management of the business, affairs, and day-to-day operations of Clovis shall be vested in each of the Managers); *In re Am. Int'l Grp., Inc., Consol. Deriv. Litig.*, 976 A.2d 872, 887 (Del. Ch. 2009) ("When a corporation empowers managers with the discretion to handle certain matters and to deal with third parties, the corporation is charged with the knowledge of those managers when the corporation is sued by innocent parties."), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. Gen. Re Corp.*, 11 A.3d 228 (Del. 2010); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal.").

[365] Blanch Defs.' Ans. Br. 11 (citing Tr. 48:6–22 & 90:3–10 (Diamond) and Tr. 607:2–21 & 608:17–23 (Blanch)). The cited testimony does not address Blanch's knowledge of the $10,000 payments to Plaintiff. Blanch did, however, testify that he was not aware that money was being wired back to Plaintiff. Tr. 658:5–8 (R. Blanch). Obviously, Blanch became aware of the payments at some point, but he did not indicate when he became aware of the payments.

anyone.[366] The payments are reflected in Clovis's 2015 tax return.[367] Furthermore, the payments ceased after Skinner told Diamond that Aaron, a non-member of Clovis, told Skinner "not to send any more money back to Stone & Paper Investors."[368] Given that Aaron, Blanch's friend,[369] was aware of the payments to Stone & Paper as of December 2014, it is not credible that Blanch was unaware of them in 2014.[370] More important, it is not credible that Clovis was unaware of the payments in 2014. Clovis had knowledge of the payments to Plaintiff as far back as April in 2014. Clovis's five-year delay in bringing its claim is presumptively not reasonable. Therefore, Clovis's claim pertaining to the 2014 Payments is time-barred by laches.[371]

---

[366] Tr. 324:19–20 (Skinner) ("[Diamond] never told me to specifically - - he never said don't mention [the $10,000 monthly payments]."). Skinner testified that "Blanch didn't know about the payments." Tr. 473:14–15. Skinner did not indicate when Blanch first learned of the payments.

[367] PTO ¶ 20.

[368] Tr. 49:7–8 (Diamond).

[369] Tr. 518:24–519:1 (R. Blanch) ("Drew [Aaron] and I had been close friends, pretty good friends, for years, since 2006, 2007.").

[370] Blanch is "designated as the Tax Matters Partner of the Company for purposes of Chapter 63 of the [Internal Revenue] Code and Treasury Regulations thereunder." LLC Agreement § 10.9. Blanch understood this to mean that he would "liaison between . . . the IRS and the members in the entity." Tr. 697:13–17 (R. Blanch).

[371] Clovis has not directly asserted any claims against Skinner for approving or making these payments to Stone & Paper.

## 2. AMEX Account Payments

Clovis argues that "[Stone & Paper] knowingly violated Section 9.6 of the LLC Agreement when Clovis Holdings' funds were used to pay the American Express card account."[372] This breach of contract claim fails. Stone & Paper took no affirmative action that amounted to a breach of a contractual obligation. It was Skinner, acting on behalf of Clovis, who requested to use Diamond Carter Trading's AMEX Account for Clovis's own expenses.[373] Diamond and Carter, who were the principals of both Stone & Paper and Diamond Carter Trading, permitted Clovis to use the AMEX Account on the condition that Skinner allocate the charges between the two entities and have Clovis pay for its own expenses.[374] Diamond and Carter did not ask Clovis to apply its funds towards any non-Clovis charges on the AMEX Account, much less any charges that would amount to a return of capital to Stone & Paper. Although the AMEX Account belonged to Carter, Skinner had the sign-in credentials for the AMEX Account and regularly made payments.[375] It was Skinner who was responsible for allocating charges between Clovis and Diamond Carter Trading, and it was Skinner who processed every dollar that left Clovis's checking

---

[372] Def.'s Opening Post-Tr. Br. 11.

[373] Tr. 14:20–15:16 (Diamond).

[374] *Id.*

[375] Tr. 171:5–21 (Diamond) (testifying that, prior to Clovis, Skinner was responsible for paying the AMEX Account out of DCT's accounts); Tr. 440:12–441:2 (Skinner) (testifying that Skinner would log in with Carter's credentials and make payments).

account, including payments to the AMEX Account.[376]  Clovis has not factually or legally established that Stone & Paper is liable for Skinner's actions regarding the payments to the AMEX Account.  For this reason, Clovis has not established that Stone & Paper breached the LLC Agreement with respect to Clovis's AMEX Account payments.

### 3. Milton Berg Newsletter

Clovis argues that Stone & Paper breached Section 9.6 of the LLC Agreement by allowing Clovis to pay $21,000 for the Milton Berg investment newsletter.  The Milton Berg newsletter is an investment newsletter that provided stock trading recommendations.[377]  In 2016, Diamond Carter Trading had a bill from the publisher of the Milton Berg newsletter for $21,000.[378]  At the same time, Clovis owed money to Diamond Carter for having underpaid its share of the AMEX Account charges.[379]  Diamond and Skinner conferred and decided that Clovis would pay the bill for the Milton Berg newsletter as a way to reduce Clovis's debt to Diamond Carter Trading.[380]

---

[376] Tr. 348 (Skinner).

[377] Tr. 89 (Diamond).

[378] Tr. 426 (Skinner).

[379] Tr. 90 (Diamond).

[380] Diamond testified that Skinner proposed that Clovis pay the bill, while Skinner testified that Diamond asked him to pay the bill.  *Compare* Tr. 90:2–16 (Diamond), *with id.* 425:4–426:10 (Skinner).

Stone & Paper argues that Section 9.6 of the LLC Agreement is inapplicable to the payment for the Milton Berg newsletter because it was not a return of capital.[381] Stone & Paper, however, is prevented from making this argument due to judicial estoppel. "Judicial estoppel acts to preclude a party from asserting a position inconsistent with a position previously taken in the same or earlier legal proceeding." *Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859 (Del. 2008). The doctrine is appropriate in "lengthy litigation such as this." *Id.* "Judicial estoppel operates only where the litigant's [position] contradicts another position that the litigant previously took *and* that the Court was successfully induced to adopt in a judicial ruling." *Id.* at 859–60 (internal quotation omitted and emphasis in original).

In moving to dismiss Clovis's original counterclaims, Stone & Paper argued that Clovis's unjust enrichment claim, including Clovis's allegation that the payment for the Milton Berg newsletter unjustly enriched Stone & Paper, "[relied] on the same factual basis, and [sought] the same damages, as the breach of contract claim."[382] Stone & Paper argued that the claim, which was "premised on allegations that Stone & Paper 'misappropriated' funds of Clovis by receiving a return of some [of] its initial capital contribution," should be dismissed because the alleged

---

[381] Pl.'s Ans. Post-Tr. Br. 22–23 (citing Def.'s Opening Post-Tr. Br. 8, 10).

[382] Pl.'s Opening Br. in Supp. of Mot. to Dismiss at 34 (Dkt. 83).

wrongdoing was governed by Section 9.6 of the Operating Agreement.[383]  Stone & Paper now argues that the very same allegations are *not* governed by Section 9.6. Stone & Paper's new position is inconsistent with its previous position.  The Court relied on Stone & Paper's earlier position when it ruled in Stone & Paper's favor and dismissed the unjust enrichment claim as to the AMEX Account and the Milton Berg newsletter, because the claim had no basis "independent of the allegations supporting the breach of contract claim."  2020 Memorandum Opinion, 2020 WL 34996694, at *13; *id.* at *7 n.30 (citing Stone & Paper's brief).  For this reason, Stone & Paper is estopped from now contending that Section 9.6 is inapplicable to the payment for the Milton Berg newsletter.

Clovis has established that payment for the Milton Berg newsletter was an improper return of capital to Stone & Paper.  As of 2016, Clovis has not generated any revenue and had no other source of funding.  All of Clovis's funds came from Stone & Paper's initial $3.5 million capital contribution.  Thus, the $21,000 that left Clovis to pay for the Milton Berg newsletter necessarily came from Stone & Paper's capital contribution.  The subscription for the Milton Berg newsletter benefitted Stone & Paper's principals, Diamond and Carter, by substituting for a payment that they would have otherwise needed to pay with funds from Diamond Carter Trading,

---

[383] *Id.*

another company of theirs.[384]  Furthermore, Diamond knew that Clovis would be paying for a Diamond Carter Trading expense.  Stone & Paper's prior knowledge of the arrangement undermines the argument that Clovis, through Skinner, unilaterally made unrequested returns of capital.  Under these circumstances, the $21,000 payment for the Milton Berg newsletter was effectively a return of Stone & Paper's initial capital contribution.

Under Section 9.6 of the Operating Agreement, Stone & Paper needed approval from both Clovis managers to receive a return of its initial capital contribution.  Although Skinner was complicit in the payment, Blanch was unaware of the Milton Berg newsletter or any payment therefor until this litigation.[385]  Because Stone & Paper did not have approval of both Clovis managers, the return of capital by way of payment for the Milton Berg newsletter was a violation of the Operating Agreement.

## C.    Damages

"Where the injured party has proven the fact of damages . . . less certainty is required of the proof establishing the amount of damages.  In other words, the injured

---

[384] The fact that Clovis potentially received the benefit of reducing its debt to Diamond Carter Trading does not negate the fact that the payment was a return of capital to Stone & Paper's principals.  The companies' cash-on hand took on particular significance in late 2016, after Diamond Carter Trading had closed its brokerage account and Clovis was running low on funds.

[385] Tr. 659:18–660:13 (R. Blanch).

party need not establish the amount of damages with precise certainty 'where the wrong has been proven and injury established.'" *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015) (quoting *Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002)); *see also Older*, 2002 WL 31458243, at *15 ("Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages."). For the foregoing reasons, I find that damages are as follows:

1.      The Blanch Defendants are liable for $988,510. This amount is derived from (1) the payments from Clovis to Red Bridge;[386] (2) the payments from Clovis to Spangler and the Roth Law Firm;[387] and (3) the payments from Clovis for personal expenses of Richard Blanch and Vivianna Blanch.[388] These payments all resulted from Interested Transactions that violated Section 5.2 of the LLC Agreement. Because these are direct claims, these damages are to be paid to Plaintiff.

2.      Skinner and Skinner Capital are liable for $1,082,500. This amount is derived from the payments from Clovis to Skinner Capital,[389] minus the amount of

---

[386] PTO ¶ 12 ($797,000).

[387] *Id.* ¶ 15 ($75,000 to Spangler and $105,000 to the Roth Law Firm)

[388] *Id.* ¶ 17 ($11,510 to the Blanch Defendants' American Express card)

[389] *Id.* ¶ 12 ($1,482,500).

104

Management Fees to which Diamond acquiesced.[390]  These payments also resulted from breaches of Section 5.2.  Accordingly, these damages are to be paid to Plaintiff.

3.  Skinner is additionally liable to the Company for $510,124.35.  This amount is derived from the amount paid by Clovis to the AMEX Account.[391]  This payment breached Skinner's fiduciary duties, giving rise to a derivative claim on behalf of Clovis.  2019 Memorandum Opinion, 2019 WL 2374005, at *4 ("Any recovery related to improperly paid expenses would flow to the Company.").  Plaintiff has argued that Defendants, as wrongdoers in control of the Company and indirect owners of a majority of its equity, should be prohibited from sharing in any derivative recovery by Clovis.[392]  The parties have not meaningfully briefed this issue, and additional briefing would be helpful to the court.  The parties should submit supplemental briefing on whether the $510,124.35 should be paid to Plaintiff, to Clovis, or to the members of Clovis.

4.  Stone & Paper is liable for $21,000 to Clovis.  This amount is derived from the amount paid by Clovis for the Milton Berg newsletter.

The Blanch Defendants, Skinner, and Skinner Capital are jointly and severally liable for the damages in paragraphs 1 and 2.  *See In re Rural/Metro Corp. S'holders*

---

[390] *Supra* section II.A.1.a.i ($400,000).

[391] PTO ¶ 16.

[392] Pl.'s Opening Post-Tr. Br. 31.

*Litig.*, 102 A.3d 205, 221 (Del. Ch. 2014) ("A defendant who aids and abets a breach of fiduciary duty is jointly and severally liable for the damages resulting from the breach.").

Each of the damages awards described above is subject to the payment of pre- and post-judgment interest. The damages shall accrue pre- and post-judgment interest at the legal rate, compounded quarterly. *See, e.g.*, 6 *Del. C.* § 2301(a); *Narayanan v. Sutherland Glob. Hldgs., Inc.*, 2016 WL 3682617, at *15 (Del. Ch. Jul. 5, 2016) ("In Delaware, pre-judgment interest accrues at the legal rate set forth in 6 *Del. C.* § 2301(a) and is compounded quarterly."); *Avande, Inc. v. Evans*, 2019 WL 3800168, at *19 (Aug. 13, 2019) (awarding pre- and post-judgment interest at the legal rate).

Further, given that Plaintiff has indicated that it will not consent to the Company engaging in any business other than the purchase of ViaStone, and because the purchase of ViaStone is no longer viable, the parties should confer regarding whether dissolution of Clovis is appropriate. *See In re Silver Leaf L.L.C.*, 2005 WL 2045641, at *11 (Del. Ch. Aug. 18, 2005) (ordering dissolution of an LLC because the company was no longer able to "carry on its business in a reasonably practicable manner"). If there is any dispute, the parties shall submit supplemental briefing on that subject.

## D. Request for Fee-Shifting

Stone & Paper has sought an award of its attorneys' fees and expenses to be paid by the Blanch Defendants. The Blanch Defendants, in turn, seek an award of their attorneys' fees and expenses from Stone & Paper. This court follows what is commonly known as the American Rule. "Under the American Rule, absent express statutory language to the contrary, each party is normally obliged to pay only his or her own attorneys' fees, whatever the outcome of the litigation." *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998). There are exceptions to the American Rule, one being the bad faith exception. *Id*. While there is no single definition of bad faith conduct, "courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims." *Id*.; *accord Pettry v. Gilead Scis., Inc.*, 2021 WL 3087027, at *1 (Del. Ch. July 22, 2021). Other "behavior that has been found to constitute bad faith in litigation includes misleading the court, altering testimony, or changing position on an issue." *Beck v. Atl. Coast PLC,* 868 A.2d 840, 851 (Del. Ch. 2005).

The court defers ruling on the competing requests to shift fees. The court requests that the Blanch Defendants and Plaintiff submit supplemental briefing on the fee requests in light of the conclusions reached in this opinion on liability and damages.

107

## III. CONCLUSION

Plaintiff has failed to carry its burden of proving fraud in the inducement to invest in Clovis. Plaintiff has carried its burden of proving fraudulent concealment, and that Skinner and Blanch breached Sections 5.1, 5.2, 4.10, and 10.7 of the LLC Agreement and their fiduciary duties. Plaintiff has also carried its burden of proving that Red Bridge, Skinner, and Vivianna Blanch aided and abetted Blanch and Skinner's breaches of fiduciary duty and engaged in a civil conspiracy.

Clovis's counterclaim for breach of the LLC Agreement and unjust enrichment as to $100,000 in payments to Plaintiff in 2014 is barred by laches. Clovis has proved is claim for breach of contract concerning payment for the Milton Berg Newsletter. Clovis failed to prove its counterclaims in all other respects.

Plaintiff is awarded $988,510 in damages against the Blanch Defendants and $1,082,500 from Skinner and Skinner Capital, for which Defendants are jointly and severally liable. Clovis is awarded damages in the amount of $510,124.35 from Skinner. Clovis is also awarded damages in the amount of $21,000 from Plaintiff.

The parties are to confer and submit a schedule for supplemental briefing on the remaining issues of allocation of damages owed to Clovis and the competing applications for fee-shifting under the bad faith exception to the American Rule. Briefing shall be completed within 45 days of this opinion.